OPINION OF THE COURT
 

 Levine, J.
 

 The plaintiffs in these appeals are former retail customers of defendants Charles Schwab & Co., Inc. (Schwab) and Fidelity Brokerage Services, Inc. (Fidelity). Schwab and Fidelity are "discount” stock brokerage houses, operating nationwide, who charge reduced commissions for effecting securities transactions for their clientele and hold themselves out as offering quicker executions of orders on behalf of customers who have already decided upon what securities to buy or sell. Plaintiffs have brought these class actions on behalf of all similarly situated (unrestricted by geographical location) clients of the defendants who used their brokerage services during the 1990-1994 putative class period.
 

 
 *37
 
 In their respective complaints, which are identical in all pertinent respects, plaintiffs seek a return of commissions, compensatory and punitive damages, an accounting and injunctive relief based on common-law theories of breach of fiduciary duty and conversion arising out of the agent/principal relationships between defendants and the putative class members, and upon alleged statutory violations.
 
 [1]
 

 All of the plaintiffs’ causes of action arise out of defendants’ receipt of what is known in the securities industry as "order flow payments.” The practice of order flow payment consists of remuneration in the form of monetary or other benefits given to retail securities broker-dealers for routing customers’ orders for execution to wholesale dealers or other market makers in the subject securities. Paying for order flow originated many years ago in the over-the-counter (OTC) market, when regional broker-dealers were paid a fee by wholesale market makers in the OTC security bought or sold, for directing orders to them for execution.
 
 [2]
 
 With the advent of computer technological advances capable of providing an entirely automated market system independent of the floor of any stock exchange (such as the National Association of Securities Dealers Automated Quotation System), and automated trading systems permitting accelerated execution of orders by regional exchange specialists, OTC market makers and member firms of the regional stock exchanges could compete for orders in listed stocks with the national New York and American Stock Exchanges.
 
 [3]
 
 Thus, routing orders in listed stocks to OTC market makers and regional exchange specialists has more recently become a major source of order flow payments to retail broker-dealers.
 
 [4]
 

 Plaintiffs’ complaints allege that the defendants’ acceptance of order flow payments breached the fiduciary relationship between them and their customers in the plaintiff member classes
 
 *38
 
 under common-law agency principles. Plaintiffs also allege that the acceptance of order flow payments itself is illegal and actionable because it violates a broker’s duty to obtain the "best execution” (i.e., execute the transaction under the most favorable possible terms) of its customers’ orders. They also allege illegality of the acceptance of order flow payments as a form of commercial bribery (citing Penal Law § 180.05) and a violation of State securities law (the Martin Act) (citing General Business Law § 352-c).
 

 Schwab and Fidelity moved to dismiss the complaints on grounds,
 
 inter alia,
 
 that enforcing plaintiffs’ State common-law and statutory causes of action would violate the United States Constitution’s Commerce Clause (US Const, art I, § 8) and Supremacy Clause
 
 {id.,
 
 art VI, cl [2]), and interfere with the primary jurisdiction of the Securities and Exchange Commission (SEC). In each case, the complaint was dismissed by Supreme Court under the Supremacy Clause, on the ground that plaintiffs’ causes of action were preempted by the Securities Exchange Act of 1934, as amended, and the SEC regulations promulgated thereunder.
 

 The Appellate Division modified in each case
 
 (Guice v Schwab & Co.,
 
 214 AD2d 53;
 
 Evangelist v Fidelity Brokerage Servs.,
 
 224 AD2d 211). The Court in
 
 Guice
 
 noted that plaintiff "as limited by his brief, does not seek to bar totally the practice of payments for order flow, 'except where, as here, "full and frank disclosure” has not been made’ ” (214 AD2d, at 55). The Court concluded that, upon that basis, plaintiff Guice’s causes of action were not preempted by Federal law and that the primary jurisdiction doctrine was not a bar. Accordingly, the Court reinstated all of plaintiff’s causes of action (except that based upon the Martin Act) and remitted to Supreme Court to determine the remaining grounds for defendant’s motion to dismiss. The subsequent decision of the Appellate Division in
 
 Evangelist
 
 largely followed the reasoning of the Court in
 
 Guice.
 

 [5]
 

 The Appellate Division granted Schwab and Fidelity leave to appeal in each case upon the certified question of whether its order of modification was properly made.
 

 We reverse, concluding that the plaintiffs’ remaining common-law causes of action, even as limited by plaintiffs as being based solely on inadequate or absent disclosure of receipt
 
 *39
 
 of order flow payments, are preempted by the 1975 amendments to the Securities Exchange Act and implementing SEC regulations.
 

 The Supremacy Clause of the United States Constitution, directing that Federal laws "shall be the supreme Law of the Land * * * any Thing in the Constitution or Laws of any State to the Contrary notwithstanding” (US Const, art VI, cl [2]), thereby vests in Congress the power to supersede not only State statutory or regulatory law but common law as well
 
 (see, Freightliner Corp. v Myrick,
 
 514 US 280, 286-287;
 
 International Paper Co. v Ouellette,
 
 479 US 481, 496). The preemption question is ultimately one of congressional intent
 
 (see, Barnett Bank of Marion County v Nelson,
 
 517 US —, —, 116 S Ct 1103, 1107;
 
 California Fed. Sav. & Loan Assn. v Guerra,
 
 479 US 272, 280). As recapitulated most recently in
 
 Barnett Bank (supra,
 
 517 US, at —, 116 S Ct, at 1107-1108), congressional preemptive intent may be shown from express language in the Federal statute; it may also be established implicitly because the Federal legislation is so comprehensive in its scope that it is inferable that Congress wished fully to occupy the field of its subject matter ("field preemption”), or because State law conflicts with the Federal law. Implied conflict preemption may be found when it is impossible for one to act in compliance with both the Federal and State laws, or when "the state law * * * 'stan[ds] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress’ ” (id., 517 US, at —, 116 S Ct, at 1108, quoting
 
 Hines v Davidowitz,
 
 312 US 52, 67;
 
 City of New York v Job-Lot Pushcart,
 
 88 NY2d 163, 170).
 

 Moreover, Federal administrative agency regulations, promulgated pursuant to congressional delegation of discretionary quasi-legislative authority to effectuate congressional purposes, may also preempt State law
 
 (see, Capital Cities Cable v Crisp,
 
 467 US 691, 699-700). "When the administrator promulgates regulations intended to pre-empt state law, the court’s inquiry is * * * limited: Tf [h]is choice represents a reasonable accommodation of conflicting policies that were committed to the agency’s care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned’ ”
 
 (Fidelity Fed. Sav. & Loan Assn. v De la Cuesta,
 
 458 US 141, 154, quoting
 
 United States v Shimer,
 
 367 US 374, 383 [brackets in the original]).
 

 The potential collision here of plaintiffs’ State law causes of action with Federal law arises out of the 1975 amendments to
 
 *40
 
 the Securities Exchange Act of 1934
 
 (see,
 
 Pub L 94-29, 89 US Stat 97, codified at 15 USC § 78a
 
 et seq.)
 
 and the implementing regulations of the SEC. The 1975 amendments were enacted in response to a congressional perception of "the securities industry’s languor in the face of great change and great opportunity” (Sen Rep No. 94-75, Senate Comm on Banking, Housing and Urban Affairs, 94th Cong, 1st Sess 1, reprinted in 1975 US Code Cong & Admin News 179, 180 [summarizing the 1973 Securities Industry Study Report of the Subcommittee on Securities]). Congress identified the causes of that languor to include "price fixing [of] commission rates; artificial * * * [and] unjustified barriers to access to markets and market makers; opposition to market integration from powerful vested interests, * * * [and] the absence of effective control of market developments and operations by the Securities and Exchange Commission”
 
 (id.).
 

 Thus, Congress concluded that new legislation was necessary whereby "the SEC is granted broad and flexible authority to shape
 
 a new market system
 
 adequate to the needs of investors in this country and around the world” (Sen Rep No. 94-75,
 
 op. cit.,
 
 at 2, reprinted in 1975 US Code Cong & Admin News 180 [emphasis supplied]). The bill was designed to give the SEC power to "eliminate all unnecessary or inappropriate burdens on competition,” "pursue the goal to centralized trading of securities” and "provide leadership for the development of a
 
 more coherent
 
 and rational regulatory structure to correspond to and to police effectively the new
 
 national
 
 market system” (Sen Rep No. 94-75,
 
 op. cit.,
 
 at 2, reprinted in 1975 US Code Cong & Admin News 181 [emphasis supplied]).
 

 Accordingly, to the original Securities Exchange Act’s enumerated reasons for requiring regulation of the securities industry, the 1975 amendments added the necessity "to remove impediments to and perfect the mechanisms of a national market system for securities and a national system for the clearance and settlement of securities transactions” (Pub L 94-29, § 2, 89 US Stat 97, codified at 15 USC § 78b). Congress made specific findings that it was in the public interest to assure "economically efficient execution of securities transactions; [and] fair competition among brokers and dealers, among exchange markets, and between exchange markets and markets other than exchange markets” (Pub L 94-29, § 7, 89 US Stat 111-112, codified at 15 USC § 78k-l [a] [1] [C] [i], [ii]).
 

 Under the 1975 amendments, the SEC was "directed, therefore, having due regard for the public interest, the protec
 
 *41
 
 tion of investors, and the maintenance of fair and orderly markets, to use its authority under this chapter to facilitate the establishment of a national market system for securities * * * and to carry out the objectives set forth in paragraph (1) of this subsection [15 USC § 78k-l (a) (1), quoted above]” (Pub L 94-29, § 7, 89 US Stat 112, as codified at 15 USC § 78k-l [a] [2]).
 

 Congress also authorized implementing regulations to "assure the prompt, accurate, reliable, and fair collection * * * [and] distribution * * * of information with respect to * * * transactions in such securities and the
 
 fairness
 
 and
 
 usefulness
 
 of the form and content of such information” (Pub L 94-29, § 7, 89 US Stat 115, codified at 15 USC § 78k-l [c] [1] [B] [emphasis supplied]).
 

 Acting under the foregoing legislative directions and delegation of authority, in 1977 the SEC adopted rule 10b-10, regarding information to be disclosed on customers’ confirmation statements upon the execution of customers’ orders. The disclosure requirements of rule 10b-10 were proposed by the SEC as "a
 
 uniform
 
 rule applicable to all who wish to effect transactions for or with investors” (Securities Confirmations, Proposed Rule, Securities Exchange Act Release No. 34-12806 [Sept. 16, 1976], reprinted in 41 Fed Reg 41432 [emphasis supplied]). The SEC decided the nature and extent of such disclosure by "adjust[ing] regulatory requirements to eliminate those for which compliance costs appear to be disproportionate to the practical benefits of investor protection thereby obtained”
 
 (id.).
 
 Thus, as originally adopted, rule 10b-10 contained a requirement that on a customer’s confirmation statement the broker-dealer disclose "whether any other remuneration [other than the amount received from the customer and certain specified sources] has been or will be received and that the source and amount of such other remuneration will be furnished upon written request” (Securities Confirmations, Securities Exchange Act Release No. 34-13508 [May 5, 1977] [announcing adoption of rule 10b-10], reprinted in 42 Fed Reg 25318, 25323, codified as amended at 17 CFR 240.10b-10 [a] [7] [iv]).
 

 Federal Regulation of Order Flow Payments
 

 The SEC has monitored and studied securities industry assessments of the practice of order flow payments for over a decade (Securities Exchange Act Release No. 34-33026, 58 Fed Reg 52935). The agency conducted a round table discussion on the subject in 1989
 
 (id.).
 
 The SEC consistently applied the
 
 *42
 
 confirmation statement remuneration disclosure mandate of the original rule 10b-10 to order flow payments (Securities Exchange Act Release No. 34-33026, 58 Fed Reg, at 52936-52937 ["Thus, Rule 10b-10 currently requires a broker-dealer to indicate specifically if it is receiving payment for order flow in connection with a particular customer trade.”]). It is uncontested that Schwab and Fidelity complied with the applicable disclosure requirements of then rule 10b-10 on the confirmation statements they sent to all of the putative plaintiff class members here.
 

 In 1993, the SEC proposed to amend and add to its disclosure regulations in order to address with more particularity the practice of order flow payments (Securities Exchange Act Release No. 34-33026,
 
 op. cit.).
 
 The SEC’s decision-making process entailed the same interest balancing and cost/benefit analysis as was utilized in initially adopting rule 10b-10. The SEC reviewed the potential detrimental effects of order flow payments, including potential conflicts of interest between customer and broker (Securities Exchange Act Release No. 34-33026, 58 Fed Reg 52936), possible breach of duty of best execution of orders under common-law agency principles and possible commission of commercial bribery under Federal and State law
 
 (id.,
 
 58 Fed Reg 52937-52939, 52941). Thus, the agency recognized that there were critics who advocated drastic restrictions on order flow payments, if not outright elimination of the practice
 
 (id.,
 
 58 Fed Reg 52941).
 

 Conversely, the SEC’s 1993 proposed rule making on order flow payments recognized that the securities industry gained economic advantages from the practice, which ultimately benefitted the investor public
 
 (id.,
 
 58 Fed Reg 52939-52940).
 

 The SEC rejected any extreme approach in favor of a proposed rule to expand disclosure of the receipt of order flow payments. The agency proposed to amend rule 10b-10: (1) to include a broad definition of the practice itself, that would also cover various commonly employed forms of nonmonetary remuneration; and (2) to require confirmation statement disclosure of the receipt of order flow payments and the specific dollar "amount of any monetary payment, discount, rebate or reduction of fee” received (Securities Exchange Act Release No. 34-33026, 58 Fed Reg 52940). Additionally, the SEC proposed a new rule llAcl-3 to require disclosure on each new customer’s account statement and annually thereafter as to the broker-dealer’s policies concerning the receipt of order flow payments and annual disclosure of the aggregate dollar
 
 *43
 
 amount of such payments, rebates, etc.
 
 {id.,
 
 58 Fed Reg 52940). The agency invited comment on its proposal and upon more drastic alternative regulation of order flow payments, including outright elimination of the practice or requiring dealers to pass onto customers the order flow payment received
 
 {id.,
 
 58 Fed Reg 52941-52942).
 

 Approximately a year later, the SEC announced adoption of its final rule for regulation of order flow payments (Payment For Order Flow, Securities Exchange Act Release No. 34-34902 [Oct. 27, 1994], reprinted in 59 Fed Reg 55006).
 
 [6]
 
 It explained that it rejected elimination of order flow payments entirely because the practice did not necessarily violate a broker-dealer’s best execution obligation, and that the practice benefit-ted the securities industry in lowering execution costs, in facilitating technological advances in retail customer order handling practices and in enhancing competition among broker-dealers and the various exchange and nonexchange securities markets and, thus, also worked to the advantage of investors
 
 {id.,
 
 59 Fed Reg 55007-55011). The SEC also noted the serious enforcement problems that elimination of the practice would entail and the drastic impact that an outright ban would have on the securities industry
 
 {id.,
 
 59 Fed Reg 55011).
 

 The SEC’s 1994 final rule regulating the practice of order flow payments largely followed the disclosure requirements it had proposed a year earlier. However, the agency — again employing cost/benefit analysis — eliminated the proposed disclosure requirements that confirmation statements and annual account statements show dollar amounts received for order routing. The SEC was apprehensive that mandatory disclosure of specific monetary receipts might be "unworkable”
 
 {id.,
 
 59 Fed Reg 55010) and would, at the least, impose "an extreme burden” upon broker-dealers "to determine the amount of order flow received for each order in time for a confirmation” and would entail expenses disproportionately high in relation to the potential benefits to customers
 
 {id.,
 
 59 Fed Reg 55010, n 39).
 

 
 *44
 
 Preemption Analysis As Applied to Plaintiffs Common-Law Agency Causes of Action
 

 Preemption analysis must begin with a description of the nature of plaintiffs’ causes of action and whether they represent colorable claims from which liability could be imposed. In this Court, as before the Appellate Division, plaintiffs have abandoned their statutory and common-law claims based on the per se illegality of defendants’ receipt of order flow payments. Instead, plaintiffs rely exclusively on allegations in their identical complaints that Schwab and Fidelity violated their common-law agency relationships with customers comprising the putative plaintiff classes. Specifically, they allege that Schwab and Fidelity breached their common-law duties, owed to each member of the plaintiff classes, of undivided loyalty under which they were limited to acting in any stock transaction solely in the interest of each firm’s principal.
 

 Plaintiffs allege that the acceptance by defendants of order flow payments, which they characterize as "kickbacks,” violated the agency relationship with each class member because customers’ orders were accepted and routed "without full and frank disclosure” of each defendant’s dual role in the transaction, which disclosure "to be effective must lay bare the truth, without ambiguity or reservation, in all its stark significance” (Complaints 8). Plaintiffs aver that defendants’ disclosures to the members of the class were inadequate (rendering their dual role and self-dealing actionable) in failing to inform the "class members
 
 prior to
 
 the execution of any transaction that [defendants] would be receiving a kickback, let alone the
 
 amount
 
 thereof’ (Complaints 9 [emphasis added]). They allege that the disclosure on the customers’ confirmation statements (in compliance with then rule 10b-10 [a] [7] [iii]), that remuneration was received and would be further described upon request, "falls far short of the full and frank disclosure required by law”
 
 (id.).
 

 Plaintiffs’ allegations of the standard of disclosure which must be made by an agent, having a personal interest in the principal’s transaction
 
 prior
 
 to the execution of the transaction, has support in New York agency law precedents. Indeed, plaintiffs plead verbatim this Court’s articulation of an agent’s obligation to make a full and complete disclosure of any conflict of interest in a transaction conducted for the principal:
 

 "Disclosure * * * indefinite and equivocal does not
 
 *45
 
 set the agent free to bargain for his own account or for the account of a corporation which acts through him alone. If dual interests are to be served,
 
 the disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all its stark
 
 significance”
 
 (Wendt v Fischer,
 
 243 NY 439, 443 [Cardozo, J.] [emphasis supplied];
 
 see also, TPL Assocs. v Helmsley-Spear, Inc.,
 
 146 AD2d 468).
 

 In such conflict of interest situations, the Restatement (Second) of Agency states that advance disclosure by the agent is required of "all facts which the agent knows or should know would reasonably affect the principal’s judgment” whether to consent to the agent’s dual role (Restatement [Second] of Agency § 390,
 
 and
 
 comment
 
 a,
 
 at 208-209). Thus, facially, plaintiffs have pleaded actionable claims under New York common-law agency principles, and similar claims could have been brought in the courts of other States who subscribe to the views of the Restatement (Second) of Agency. And a jury could have found against Schwab or Fidelity under these principles because no specific pretransaction disclosure of defendants’ receipt of order flow payments was made, nor of the dollar amounts of such payments to be received in the transaction, which disclosure might have affected the judgment of the customers.
 

 Upon the basis of the legislative history of the 1975 amendments to the Securities Exchange Act and the history of SEC’s implementing regulations applicable to order flow payment disclosure, we are convinced that permitting the courts of each State to enforce the foregoing common-law agency standards of disclosure on the practice of order flow payments in civil damage actions would unavoidably result in serious interference with the "accomplishment and execution of the full purposes and objectives of Congress”
 
 (Hines v Davidowitz, supra,
 
 312 US, at 67), in enacting the 1975 amendments, and would directly conflict with SEC regulations limiting the disclosure requirements regarding receipt of order flow payments to less exacting, posttransaction information on customer confirmation statements and disclosure of general policies of the broker on initial and annual customers’ account statements.
 

 As we have shown, the 1975 amendments to the Securities Exchange Act were intended to give the SEC the power administratively to develop a "coherent and rational regulatory structure to correspond to and to police effectively the
 
 *46
 
 new national market system” (Sen Rep No. 94-75, at 2,
 
 op. cit,
 
 1975 US Code Cong & Admin News 181). Among the goals of Congress in that legislation was to spark the creation of such a national market system for security trading, which would assure more "economically efficient execution of securities transactions” and promote greater competition among all securities industry players, including competition "between exchange markets and markets other than exchange markets” (Pub L 94-29, § 7, 89 US Stat, at 111-112, codified at 15 USC § 78k-l [a] [1] [C]). The SEC was directed administratively to promote those goals. Congress also recognized that its objectives would require SEC regulation of disclosures regarding security transactions, including "the fairness and usefulness of the form and content of such information”
 
 (id.,
 
 89 US Stat, at 115, codified at 15 USC § 78k-l [c] [1] [B]).
 

 Acting pursuant to that delegated authority, the SEC fashioned customer disclosure requirements applicable to the receipt of order flow payments in 1977 under the original rule 10b-10, and in 1994 by amendments to rule 10b-10 and the adoption of new rule llAcl-3. In each instance, the agency determined the nature and extent of the disclosure require-, ments, based on an interest-weighing, cost/benefit analysis. In applying the former rule 10b-10 disclosure requirements to order flow payments and in specifically addressing the practice in its 1994 rule making on the subject, the SEC recognized that order flow payments further the purposes of Congress by enhancing more efficient and less costly execution of customers’ orders and by promoting competition for order executions among all markets, with demonstrated beneficial results for individual investors.
 

 Permitting the courts of each State to impose civil liability on national securities brokerage firms, such as Schwab and Fidelity, for failure to meet more stringent common-law agency standards of disclosure of receipt of order flow payments (rather than the Federally mandated
 
 uniform
 
 specific disclosure on posttransaction confirmation statements and general disclosure on new customer account statements and annual statements, under the SEC’s amended rule 10b-10 and rule llAcl-3) would inevitably defeat the congressional purpose of enabling the SEC to develop and police that "coherent regulatory structure” for a national market system. Securities broker-dealers, confronted with the risk of nationwide class action civil damage liability, including restitution of commissions and punitive damages — as plaintiffs seek here — would be impelled
 
 *47
 
 to tailor their disclosures to each State’s common-law agency jurisprudence, and the carefully crafted SEC disclosure requirements would have little, if any, influence.
 
 [7]
 
 Surely, "[i]t is unlikely — to say the least — that Congress intended to establish such a chaotic regulatory structure”
 
 (International Paper Co. v Ouellette, supra,
 
 479 US, at 497).
 

 When, thus, a State’s regulation, through the imposition of common-law tort liability or otherwise, adversely affects the ability of a Federal administrative agency to regulate comprehensively and with uniformity in accordance with the objectives of Congress, "then the state law may be pre-empted even though 'collision between the state and federal regulation may not be an inevitable consequence’ ”
 
 (Schneidewind v ANR Pipeline Co.,
 
 485 US 293, 310, quoting
 
 Northern Gas Co. v Kansas Commn.,
 
 372 US 84, 91-92).
 

 State civil actions based upon common-law agency doctrine would thwart the objectives of Congress in a second respect. As already noted, the SEC determined that the practice of order flow payments brings about constructive results furthering the goals of Congress in the 1975 amendments to the Securities Exchange Act. It also found that stricter disclosure requirements than those ultimately adopted under its rules might be unworkable or costly out of all proportion to possible benefits to investors. Thus, the SEC rejected proposals for more exacting disclosure, anticipating that, at the least, the increased cost of such disclosure would be passed onto customers in higher commissions or to market makers in higher fees for order routing — outcomes clearly counterproductive to congressional objectives of economically efficient execution of orders, lower execution costs and vigorous competition among OTC and exchange markets. At worst, onerous stricter disclosure costs plus the threat of lawsuits all around the country, based on breach of common-law agency relationships, would likely result in many brokerage firms abandoning acceptance of order flow payments altogether, an even more drastic undermining of congressional objectives. Thus, for these reasons, we agree With the Minnesota Supreme Court’s conclusion in
 
 Dahl
 
 
 *48
 

 v Charles Schwab & Co.
 
 (545 NW2d 918, 925,
 
 cert denied
 
 — US —, 117 S Ct 176 [Oct. 7, 1996]), that these likely deleterious if not ruinous effects upon a securities industry practice the SEC, under its delegated securities industry supervisory powers has determined will further the policies of Congress, are alone sufficient to require preemption
 
 (see, Capital Cities Cable v Crisp,
 
 467 US 691, 707-708,
 
 supra).
 
 Put another way, the SEC, acting reasonably within its rule-making authority, adopted a policy, incorporated in regulations, of permitting the practice of order flow payments and not unduly inhibiting the practice by oppressive disclosure requirements. These goals and policies of the SEC are "antithetical to threshold limitations placed” on order flow payment practices in the form of severely, if not prohibitively, burdensome additional disclosure requirements imposed by application of each State’s common-law of agency in civil damage actions
 
 (Doctor’s Assocs. v Casarotto,
 
 517 US —, —, 116 S Ct 1652, 1657 [May 20,1996]).
 

 We reject plaintiffs’ contention that there is no preemption here because compliance with State common-law disclosure standards under agency doctrine would not prevent compliance with SEC regulatory disclosure requirements, and because greater disclosure promotes the same investor-protection purposes of the Federal regulations. Even if the goals of Federal and State law are the same, "[a] state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal”
 
 (International Paper Co. v Ouellette,
 
 479 US, at 494,
 
 supra).
 
 The stricter standards of order flow payment disclosure which may be required under State common-law agency principles inevitably will supplant the disclosure rules of the SEC on the same subject and come to dominate the relationship between broker and customer, since the broker would not be able to avoid civil liability for acceptance of order flow payments merely by complying with Federal regulations.
 

 Unquestionably, however, State common-law standards for disclosure when an agent has a financial stake in a transaction effected on behalf of a principal are set generally, and would be applied to broker-dealer receipt of order flow payments, without engaging in the policy choices and balancing of the competing legitimate interests of investors, exchange and non-exchange markets and other participants in the securities industry, that the SEC was charged by Congress to perform and that are involved in regulation of order flow payments. Thus, although both State common-law actions and Federal
 
 *49
 
 regulations may promote broker-dealers’ disclosure to customers, State enforcement of agency law standards of disclosure cannot help but upset the policy-based delicate balance Congress directed the SEC to achieve in the regulatory regime envisaged under the 1975 amendments to the Securities Exchange Act. Here, as in
 
 International Paper Co. v Ouellette (supra)
 
 (where State common-law nuisance actions also threatened to upset a Federally designed, legislative/regulatory interest-weighing cost/benefit approach), "[i]t would be extraordinary for Congress, after devising an elaborate [balanced regulatory] system that sets clear standards, to tolerate common-law suits that have the potential to undermine this regulatory structure”
 
 (id.,
 
 479 US, at 497;
 
 see also, Gordon v New York Stock Exch.,
 
 422 US 659, 688-690;
 
 Darling v Mobil Oil Corp.,
 
 864 F2d 981, 987-988).
 

 The Effect of Securities Exchange Act § 28 (a) on the Preemption Issue
 

 Plaintiffs contend that any inference of preemptive intent by Congress under the 1975 amendments to the Securities Exchange Act is negated by the "savings” clauses incorporated in the statute by section 28 (a) of the Act (15 USC § 78bb [a]). That section provides that the Exchange Act’s rights and remedies are "in addition to any and all other rights and remedies that may exist at law or in equity,” and that the Act does not "affect the jurisdiction of [State securities regulatory bodies] over any security or any person
 
 insofar as it does not conflict
 
 with the provisions of this title or the rules and regulations thereunder” (emphasis supplied). We conclude that section 28 (a) does not foreclose the implied conflict preemption we find here. First, the legislative history of section 28 (a) indicates that its purpose was to "leave the States with as much leeway to regulate securities transactions as the Supremacy Clause would allow them in the absence of such a provision,” and particularly, "to save state blue-sky laws from pre-emption”
 
 (Leroy v Great W. United Corp.,
 
 443 US 173, 182, n 13 [describing the testimony of the principal draftsman of the Exchange Act in Senate hearings on the legislation]).
 

 Substantially similar savings clauses have been interpreted as only negating implied
 
 field
 
 preemption, but not conflict preemption, leaving the courts to determine when any given State regulation is impliedly preempted because it prevents compliance with the Federal law or the full achievement of
 
 *50
 
 congressional, objectives
 
 (International Paper Co. v Ouellette, supra,
 
 479 US, at 492-494;
 
 see also, Edgar v MITE Corp.,
 
 457 US 624, 631 [plurality opinion construing Securities Exchange Act § 28 (a)]).
 

 Finally, the Supreme Court in
 
 Freightliner Corp. v Myrick
 
 (514 US 280,
 
 supra),
 
 held that inclusion of an express provision in a Federal statute dealing with the preemption issue may support an inference negating implied preemption, but this "does not mean that the express clause entirely forecloses any possibility of implied pre-emption”
 
 (id.,
 
 514 US, at 288). Any inference negating implied preemption was completely overcome here because, as we have demonstrated, enforcement of State common-law duties of disclosure under its agency jurisprudence not only would have "the potential,” but would inevitably "undermine [the finely crafted and balanced Federal] regulatory structure”
 
 (International Paper Co., supra,
 
 479 US, at 497).
 

 Accordingly, in each action the order of the Appellate Division should be reversed, the complaint dismissed, and the certified question answered in the negative, with costs.
 

 Chief Judge Kaye and Judges Simons, Titone, Bellacosa, Smith and Ciparick concur.
 

 In each action: Order reversed, etc.
 

 [1]
 

 . At the time Supreme Court dismissed each of these actions, neither had yet been certified as a class action.
 

 [2]
 

 . Payment For Order Flow, Securities Exchange Act Release No. 34-33026 (Oct. 6, 1993), reprinted in 58 Fed Reg 52934, 52935-52936; Facciolo and Stone,
 
 Avoiding the Inevitable: The Continuing Viability of State Law Claims in the Face of Primary Jurisdiction and Preemption Challenges Under the Securities Exchange Act of
 
 1934,1995 Colum Bus L Rev 525, 640 (hereinafter cited as "Facciolo and Stone”).
 

 [3]
 

 . Securities and Exchange Commission Division of Market Regulation,
 
 Market 2000: An Examination of Current Equity Market Developments,
 
 at 8-9 (1994).
 

 [4]
 

 . Securities Exchange Act Release No. 34-33026,
 
 op. cit.,
 
 58 Fed Reg 52936.
 

 [5]
 

 . Thus, similarly, all of Evangelist’s causes of action except the Martin Act claim were reinstated.
 

 [6]
 

 . In pertinent part the final rule added a new subdivision (e) (9) (defining payment for order flow), added a new subdivision (a) (7) (iii) (governing disclosure of order flow payment at confirmation), and added a new rule llAcl-3 (governing disclosure on customer account statements). These changes were codified respectively at 17 CFR 240.10b-10 (e) (9) (now 17 CFR 240.10b-10 [a] [9]); (a) (7) (iii), and 17 CFR 240.11Acl-3. Additionally, former subdivision (a) (7) (iii) of rule 10b-10 — the original confirmation statement remuneration requirement — was redesignated subdivision (a) (7) (iv).
 

 [7]
 

 .
 
 Securities industry representatives expressed to the SEC their apprehension of exposure to liability if common-law agency principles were allowed to prevail over SEC uniform disclosure requirements (see,
 
 e.g.,
 
 Letter to Secretary, SEC from Andrew M. Klein, Schiif Hardin & Waite [July 5, 1990]), quoted in Facciolo and Stone,
 
 op. cit.,
 
 1995 Colum Bus L Rev, at 657, n 410;
 
 see also,
 
 Securities Exchange Act Release No. 34-33026, 58 Fed Reg 52938-52939).