DAVID ZANNINI ET AL., ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, APPELLANTS, V. AMERITRADE HOLDING CORP. ET AL., APPELLEES.

667 N.W.2d 222

Filed August 1, 2003.   No. S-02-142.

E. Virgil Falloon, of Falloon Law Office, and of Counsel, Herbert E. Milstein, Lisa M. Mezzetti, and Victoria S. Nugent, of Cohen, Milstein, Hausfeld & Toll, P.L.L.C., and Burton H. Finkelstein, Douglas W. Thompson, Jr., and Richard M. Volin, of Finkelstein, Thompson & Loughran, for appellants.

Robert J. Kriss and Adrienne L. Hiegel, of Mayer, Brown, Rowe & Maw, and Patrick B. Griffin and Richard P. Jeffries, of Kutak Rock, L.L.P., for appellees.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.
## I. NATURE OF CASE
Appellants, David Zannini, Christopher Pitcher, Anthony Parente, and William Sigler, filed this purported class action on behalf of themselves as well as all other subscribers to the brokerage and securities clearing services offered by appellees, Ameritrade Holding Corp.; Ameritrade, Inc.; Ameritrade Clearing, Inc.; and Advanced Clearing, Inc. (collectively Ameritrade). Appellants' "Second Amended Class Action Complaint at Law" is the operative petition (petition). The focus of the petition taken as a whole is that Ameritrade failed to provide securities trading services as advertised or agreed to. In their petition, appellants allege, inter alia, that Ameritrade engaged in acts of fraudulent inducement, misrepresentation, and negligence; breached its subscriber agreements; and violated Nebraska's Consumer Protection Act, Neb. Rev. Stat. § 59-1601 et seq. (Reissue 1998), with regard to the brokerage services it provided appellants. The district court granted Ameritrade's motion for summary judgment and dismissed appellants' petition.

We conclude that the properly received evidence and the pleadings do not support the district court's order granting summary judgment. We reverse, and remand for further proceedings.

## II. STATEMENT OF FACTS

Ameritrade is a retail discount securities brokerage firm which provides subscribers with opportunities to trade securities by a variety of methods, including by Internet, by automated telephone system, and by personally speaking to a broker on the telephone. Appellants allege that individuals subscribe to Ameritrade's services by entering into a contract.

Appellants, as Ameritrade subscribers, filed this purported class action against Ameritrade in the district court for Douglas County. The action has not been certified as a class action. In the petition filed September 10, 1999, appellants claim to represent a class of approximately 217,000 people who were Ameritrade subscribers during the time period of February 1, 1998, to May 10, 1999 (the class period). The petition, consisting of 90 numbered paragraphs, is divided into several sections, including "Nature of the Action," "Venue and Jurisdiction," "Class Action Allegations," and "Substantive Allegations," followed by seven separately identified "causes of action" which begin at paragraph 52. Each "cause of action" incorporates the previous allegations.

In paragraph 1 of the "Nature of the Action" section, appellants allege that they seek to recover damages caused by Ameritrade's violations of Nebraska's Consumer Protection Act and the common law. In paragraph 3 of the "Nature of the Action" section, appellants allege generally that Ameritrade's system was "overburdened, causing frequent inability to place trades and substantial delays in the placement and execution of trades." In paragraph 25 of the "Substantive Allegations" section, appellants allege that they entered into a contract with Ameritrade.

In paragraph 28 of the "Substantive Allegations" section, appellants allege, inter alia, that during the class period they

> encountered difficulties in placing trade orders via the internet[, that] the automated telephone trade services were not available[, and that] delays occurred when [they tried] to reach brokers. [Appellants] also experienced significant

lag times as a result of Ameritrade's untimely execution of orders . . . .

Appellants allege that this delay resulted from an aggressive and successful marketing campaign in which Ameritrade's subscriber base increased dramatically and that Ameritrade's systems were unable to handle this growth. According to paragraph 41 of the "Substantive Allegations" section,

> The delays associated with placing and executing trades were the result of [Ameritrade's] emphasis on marketing and sales to increase the subscribership. Meanwhile, [Ameritrade was] neglecting Ameritrade's systems and existing subscribers because the systems could not handle the additional volume. [Ameritrade] at all relevant times knew of the problems and failed to adequately remedy the difficulties, warn subscribers of the difficulties, or adequately provide subscribers with the means by which to avoid such problems.

In paragraph 45 of the "Substantive Allegations" section, appellants allege that they have been "consistently unable to utilize Ameritrade's [s]ervices as a result of [Ameritrade's] over-marketing and failure to maintain adequate systems." Paragraph 45 contains four subsections in which it is alleged that each of the four named plaintiffs suffered financial loss with respect to particular trading orders identified therein.

Based upon these and other similar assertions, appellants set forth seven "causes of action" in their petition. In their first "cause of action," entitled "Fraudulent Inducement," appellants allege that Ameritrade made "material misrepresentations" and "failed to inform" appellants that the Ameritrade systems had "technological limitations which led to significant delays in *placing* and *executing* trades, affecting the terms of trades." (Emphasis supplied.) In their second "cause of action," entitled "Negligent Misrepresentation," appellants allege, inter alia, that Ameritrade negligently misrepresented to appellants that it was capable of allowing appellants to "place orders on-line or alternatively place orders via telephone in a timely manner without unreasonable delay," and further that Ameritrade misrepresented that its systems were "capable of quickly executing such trades" without delay. In the third enumerated "cause of action," captioned

"Breach of Contract and of the Implied Covenant of Good Faith and Fair Dealing," appellants allege that they each entered into subscriber agreements with Ameritrade and that Ameritrade breached those agreements by forcing appellants to "[experience] delays in placing trades [and experience] unreasonable lag times in Ameritrade's execution of trades." In their fourth "cause of action," appellants allege, generally, that Ameritrade engaged in unfair and deceptive practices in violation of Nebraska's Consumer Protection Act through material misrepresentations and false advertising. Appellants' fifth cause of action, entitled "Negligence," alleges, inter alia, that Ameritrade acted negligently through its misrepresentations concerning its ability to place and execute trade orders. The sixth and seventh "causes of action," labeled "Unjust Enrichment" and "Injunctive and Equitable Relief," respectively, do not constitute separate claims which appellants assert against Ameritrade, but, rather, set forth the nature of relief appellants seek.

We note that each "cause of action" contains a paragraph generally stating the following: "[Appellants] reallege each allegation contained in each of the paragraphs above as if fully set forth herein." As a consequence, each "cause of action" incorporates the general allegations and the allegations of the preceding "causes of action."

On October 10, 2000, Ameritrade filed its motion for summary judgment, urging summary judgment on four separate grounds. Ameritrade argued, restated, that appellants' claims (1) failed to state a cause of action for which relief may be awarded, (2) were "barred" by the Commerce Clause of the U.S. Constitution, (3) were without merit because there is no industry standard for "execution time" in terms of the deadline for executing a trade, and (4) were preempted under the Supremacy Clause of the U.S. Constitution.

Ameritrade's motion came on for hearing on December 13, 2000. During the summary judgment hearing, in support of its motion, Ameritrade's counsel offered and caused to be admitted into evidence two exhibits, exhibit 6, a Securities and Exchange Commission document describing the "best execution" rule, and exhibit 7, the affidavit of William Wood. Following the same hearing, appellants' counsel marked two exhibits, exhibits 8 and

9, but the record does not reflect that these additional exhibits were either offered or admitted into evidence. In an order entered January 3, 2002, the district court granted Ameritrade's motion for summary judgment, dismissing appellants' petition in its entirety. On February 1, 2002, appellants filed their notice of appeal.

## III. ASSIGNMENTS OF ERROR

On appeal, appellants assign four errors. Appellants claim, renumbered and restated, that the district court (1) erred in granting Ameritrade's motion for summary judgment, based upon "inappropriate legal and evidentiary standards"; (2) improperly dismissed appellants' Consumer Protection Act claim; (3) erroneously dismissed appellants' negligence claim based upon the premise that appellants have a commercial relationship with Ameritrade; and (4) erroneously concluded that federal law preempted appellants' negligence claim.

## IV. STANDARDS OF REVIEW

Summary judgment is proper when the pleadings and the evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Hamilton v. Nestor*, 265 Neb. 757, 659 N.W.2d 321 (2003); *Bennett v. Labenz*, 265 Neb. 750, 659 N.W.2d 339 (2003). In appellate review of a summary judgment, the court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Bennett v. Labenz, supra.*

## V. ANALYSIS

### 1. SUMMARY JUDGMENT AND RECORD ON APPEAL

Before assessing the correctness of the district court's ruling on Ameritrade's motion for summary judgment, it is necessary to ascertain the scope of the record properly before the district court. The record reflects that during the hearing on Ameritrade's motion for summary judgment, Ameritrade's counsel offered and the district court admitted in evidence two exhibits, exhibits 6 and 7. The record further reflects that after the hearing was adjourned,

appellants "marked" two additional exhibits, exhibits 8 and 9. According to the record on appeal, however, these additional exhibits were neither offered nor admitted into evidence for purposes of the summary judgment hearing.

Furthermore, for the sake of completeness, we note that on April 30, several months after the district court's January 3, 2002, ruling on Ameritrade's motion for summary judgment and appellants' filing of this appeal, the parties entered into a stipulation with regard to the record. Although not "so ordered" or certified, the parties stipulated that certain documents, marked as exhibits 10 through 28, were "to be simply marked and made a part of the bill of exceptions" and that other documents, marked as exhibits 29 through 32, were "to be marked and made a part of the bill of exceptions and received into evidence."

In connection with motions for summary judgment, we have stated that "[u]nless the [exhibit] is marked, offered, and accepted, it does not become part of the record and cannot be considered . . . as evidence in the case." *Altaffer v. Majestic Roofing*, 263 Neb. 518, 520-21, 641 N.W.2d 34, 37 (2002). We have also stated that exhibits which were not "offered, marked, or received by the trial judge at the summary judgment hearing . . . may not be considered on appeal." *Rodriguez v. Nielsen*, 259 Neb. 264, 269, 609 N.W.2d 368, 372 (2000). See, also, *DeCosta Sporting Goods, Inc. v. Kirkland*, 210 Neb. 815, 316 N.W.2d 772 (1982) (stating that exhibits not received into evidence at trial court level do not form part of bill of exceptions on appeal).

In the instant case, the only exhibits marked, offered, and received in evidence by the district court at the hearing on Ameritrade's motion for summary judgment were Ameritrade's exhibits 6 and 7. Although "marked" as exhibits, the record on appeal does not reflect that exhibits 8 through 32 were either offered or admitted in evidence by the district court. Because these additional exhibits were neither offered nor admitted in evidence, they were not properly before the district court in its evaluation of the motion for summary judgment and are not part of the record which can be considered in this appeal in which we are asked to review the propriety of the district court's ruling on Ameritrade's motion for summary judgment. Accordingly, in considering appellants' assignments of error, the evidentiary

items before this court are exhibits 6 and 7. In connection with the preemption analysis, we also refer to appellants' petition. See *Hamilton v. Nestor*, 265 Neb. 757, 659 N.W.2d 321 (2003).

## 2. EVALUATION OF AMERITRADE'S EVIDENCE IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

This court has stated that the primary purpose of the summary judgment procedure is to pierce the allegations made in the pleadings and show conclusively that the controlling facts are other than as pled, and thus resolve, without the expense and delay of trial, those cases where there exists no genuine issue as to any material fact or as to the ultimate inferences to be drawn therefrom, and where the moving party is entitled to judgment as a matter of law. See, *Hogan v. Garden County*, 264 Neb. 115, 646 N.W.2d 257 (2002); *City State Bank v. Holstine*, 260 Neb. 578, 618 N.W.2d 704 (2000). The party moving for summary judgment has the burden of showing that no genuine issue as to any material fact exists. That party must therefore produce enough evidence to demonstrate his or her entitlement to a judgment if the evidence remains uncontroverted, after which the burden of producing contrary evidence shifts to the party opposing the motion. *Newman v. Thomas*, 264 Neb. 801, 652 N.W.2d 565 (2002).

From the evidence properly before both the district court and this court, we conclude that Ameritrade failed to demonstrate its entitlement to a judgment. Exhibit 6 is a document apparently prepared by the Securities and Exchange Commission, describing the "best execution" rule, which rule, discussed in greater detail below, requires a broker-dealer to use reasonable efforts to maximize the economic benefit to the client in each transaction. See *Newton v. Merrill, Lynch, Pierce, Fenner & Smith*, 135 F.3d 266, 270 (3d Cir. 1998), *cert. denied* 525 U.S. 811, 119 S. Ct. 44, 142 L. Ed. 2d 34. The document can best be characterized as informational and does not contribute substantively to establishing Ameritrade's entitlement to a judgment.

Exhibit 7 is the affidavit of Wood, dated October 10, 2000. Wood is identified as the executive vice president of Ameritrade, Inc. Wood's affidavit addresses the execution time of three orders which were alleged in paragraph 45 of the petition to have been

placed by appellants. Exhibit 7 also refers to two orders alleged to have been placed by appellants which were not executed.

Although Zannini complains about three trades in paragraph 45 of the petition, the Wood affidavit refers only to the execution of two. Although Sigler complains about the delay and difficulty in placing an order, the Wood affidavit speaks only to the time of execution after the order was placed. Although Parente complains about the delay in placing a "stop-order," the Wood affidavit speaks only to the time Ameritrade took to route the order to the market. Although Pitcher complains that his stop-order sales transaction at $104 per share on 1,000 shares of a certain stock was placed and remained unexecuted 10 minutes later, the Wood affidavit speaks only to the time Ameritrade took to route the order to the market "at the stop-limit price of $105-1/2 per share."

The Wood affidavit does not respond to all of the allegations in paragraph 45 of the petition, much less present evidence which would dispose of all the "causes of action" set forth in paragraph 52 et seq. In summary, Ameritrade has failed to properly produce evidence demonstrating its entitlement to judgment. See *Newman v. Thomas, supra.*

### 3. FIFTH "CAUSE OF ACTION," NEGLIGENCE: BEST EXECUTION AND OPERATIONAL CAPABILITY

Appellants contend on appeal that the district court erred in dismissing their fifth "cause of action." Despite the absence of an evidentiary record supporting its entitlement to summary judgment, Ameritrade nevertheless argues on appeal that based on the petition, the district court did not err in entering summary judgment in its favor as to the fifth "cause of action," entitled "Negligence." Ameritrade argues that on the face of the petition, this "cause of action" can be generally characterized as claiming that Ameritrade failed in its duty to satisfy the "best execution" rule and failed to meet standards of operational capability. Ameritrade states that appellants are unable to establish their claims relative to best execution and that their claims relative to operational capability are preempted by federal law. Given the record and language of the petition, we agree with appellants that the district court erred in dismissing the fifth "cause of action."

## (a) "Best Execution" Rule

The fifth "cause of action" appears to involve the "best execution" rule, which concerns the manner in which a broker-dealer executes a client's trade.

> The duty of best execution, which predates the federal securities laws, has it roots in the common law agency obligations of undivided loyalty and reasonable care that an agent owes to his principal. Since it is understood by all that the client-principal seeks his own economic gain and the purpose of the agency is to help the client-principal achieve that objective, the broker-dealer, absent instructions to the contrary, is expected to use reasonable efforts to maximize the economic benefit to the client in each transaction.

> The duty of best execution thus requires that a broker-dealer seek to obtain for its customer order the most favorable terms reasonably available under the circumstances.

(Footnote omitted.) *Newton v. Merrill, Lynch, Pierce, Fenner & Smith*, 135 F.3d 266, 270 (3d Cir. 1998).

In addition to price, a number of other terms are relevant to best execution, including "the size of the order; . . . the speed of execution available on competing markets; . . . the trading characteristics of the security; . . . the availability of accurate information comparing markets and the technology to process such data; . . . the availability of access to competing markets; and . . . the cost of such access." Joseph M. Furey and Beth D. Kiesewetter, *On-Line Broker-Dealers: Conducting Compliance Reviews in Cyberspace*, 56 Bus. Law. 1461, 1475 (2001). See, also, *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d at 270 n.2.

Ameritrade asserts that the merits of a best execution claim must be judged on an individual order or trade basis and that because appellants refuse to identify or provide the particulars as to any trade, they cannot succeed on this theory. In making its assertion, Ameritrade relies on information, evidently obtained as the result of discovery, not properly in the record and therefore not properly before the district court or this court. Referring to the petition generally and paragraph 45 in particular, we note that appellants have identified and complained about specific orders. Assuming that Ameritrade is accurate in its assertion that

the best execution claims must be established by evidence of specific orders, and given the allegations in the petition regarding specific orders, we cannot say at this stage on this record that appellants' claims involving best execution are impossible of proof. Accordingly, we reject Ameritrade's argument.

(b) Operational Capability

On appeal, Ameritrade argues that to the extent that appellants' fifth "cause of action," entitled "Negligence," is based on the allegation that Ameritrade failed to meet a certain level of operational capability, such claim was properly dismissed by virtue of the district court's ruling in favor of Ameritrade on its motion for summary judgment. Ameritrade argues that claims involving operational capability are preempted by federal law and, thus, that dismissal of the fifth "cause of action" was proper. As we understand Ameritrade's assertion, its preemption argument is limited to claims based on operational capability as alleged in the fifth "cause of action." In this connection, we specifically make no comment regarding the potential for preemption as to any other "cause of action." On this record, we reject Ameritrade's assertion of preemption as to the fifth "cause of action" and, therefore, agree with appellants that the district court's dismissal of the fifth "cause of action" was error.

It has been proposed that a securities firm's operational capability includes the ability "to assure the prompt and accurate entry of customer orders, execution, comparison, allocation, clearance and settlement of securities transactions, the maintenance of customer accounts, and the delivery of funds and securities." Operational Capability Requirements of Registered Broker-Dealers and Transfer Agents and Year 2000 Compliance, 64 Fed. Reg. 12127, 12128 (March 11, 1999) (proposed rules).

The parties direct the court to 15 U.S.C. § 78$o$(b)(7) (2000) as the recent source of federal operational capability. This section reads in relevant part as follows:

> No registered broker or dealer or government securities broker or government securities dealer registered (or required to register) under section 78$o$-5(a)(1)(A) of this title shall effect any transaction in, or induce the purchase or sale of, any security unless such broker or dealer meets

such standards of operational capability and such broker or dealer and all natural persons associated with such broker or dealer meet such standards of training, experience, competence, and such other qualifications as the [Securities and Exchange] Commission finds necessary or appropriate in the public interest or for the protection of investors.

The parties assert, and the court understands, that federal rules and regulations defining the standards of operational capability as noted in 15 U.S.C. § 78*o*(b)(7) have been considered but were not adopted during the class period.

Federal preemption arises from the Supremacy Clause of the U.S. Constitution and is the concept that state law that conflicts with federal law is invalid. *Eyl v. Ciba-Geigy Corp.*, 264 Neb. 582, 650 N.W.2d 744 (2002). "A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000). There are three types of federal preemption: express, implied, and conflict preemption. *Eyl v. Ciba-Geigy Corp., supra.*

Express preemption occurs when the U.S. Congress explicitly declares federal legislation to have a preemptive effect. It can also occur when a federal agency, acting within the scope of its powers conferred by Congress, expressly declares an intent to preempt state law. *Id.*

Even without an express declaration from Congress or a federal agency, federal preemption may be implied, and state law claims may be preempted, when Congress is determined to have intended federal law to " 'occupy the field' " to the exclusion of state law claims. *Crosby v. National Foreign Trade Council*, 530 U.S. at 372. Finally, to the extent state law conflicts with a federal statute, the state law is "naturally preempted." *Id.* "We will find preemption where it is impossible for a private party to comply with both state and federal law . . . ." *Id.* Ameritrade indicates in its appellate brief that its preemption argument is founded on conflict preemption.

Appellants argue that the concept embodied in federal "operational capability" has long been recognized and coexists with state law principles. Brief for appellants at 30. Appellants further argue that in the absence of explicit federal rules and regulations

regarding "operational capability," their claims concerning Ameritrade's alleged failure to meet operational capability during the class period are not preempted and that the district court erred to the extent it stated to the contrary.

Ameritrade responds that by virtue of preemption, any standard of operational capability imposed as a result of a state court's ruling in this case would conflict with federal precepts regarding operational capability or federal standards to be set under 15 U.S.C. § 78o(b)(7), and that the state court should, therefore, forebear ruling on appellants' claims pertaining to operational capability. In this regard, Ameritrade relies on cases such as *Guice v. Charles Schwab & Co., Inc.*, 89 N.Y.2d 31, 674 N.E.2d 282, 651 N.Y.S.2d 352 (1996), *cert. denied* 520 U.S. 1118, 117 S. Ct. 1250, 137 L. Ed. 2d 331 (1997).

This court finds *Guice* distinguishable. In *Guice*, the New York Court of Appeals determined that although the plaintiffs-investors' complaints regarding order flow payments were alleged as common-law causes of action, such claims were preempted by the 1975 amendments to the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (2000), and implementing regulations promulgated by the Securities and Exchange Commission. The existence of explicit commission regulations was critical to the New York court's analysis and its conclusion that New York common law was preempted because it could interfere with the regulations which exhibited the method by which the federal government sought to reach its stated goal regarding order flow. See *International Paper Co. v. Ouellette*, 479 U.S. 481, 107 S. Ct. 805, 93 L. Ed. 2d 883 (1987). Compare *Roskind v. Morgan Stanley Dean Witter & Co.*, 80 Cal. App. 4th 345, 95 Cal. Rptr. 2d 258 (2000), *cert. denied* 531 U.S. 1119, 121 S. Ct. 868, 148 L. Ed. 2d 781 (2001) (stating that in absence of federal rules or regulations, plaintiff-investor action pertaining to trading ahead brought under California unfair competition law and breach of fiduciary duty not preempted).

Although decided under other federal statutory provisions, we find cases such as *Abada v. Charles Schwab & Co., Inc.*, 127 F. Supp. 2d 1101 (S.D. Cal. 2000), *Spielman v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 01 Civ. 3013(DLC), 2001 WL 1182927 (S.D.N.Y. Oct. 9, 2001), *appeal dismissed* 332 F.3d

116 (2d Cir. 2003) (appeal of district court's remand order based on perceived lack of federal jurisdiction dismissed), and *Shaw v. Charles Schwab & Co., Inc.*, 128 F. Supp. 2d 1270 (C.D. Cal. 2001), more instructive.

*Abada* involved an investor's allegations under state law that defendant's online broker failed to timely place his order contrary to the broker's advertisements. In *Abada*, the federal court rejected the defendant's arguments that the claim was solely subject to the federal Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737, 756 (1995) (codified in part at 15 U.S.C. §§ 77z-1 and 78u (Supp. V 1999)). The case was remanded to the state court. The court observed that "any loss suffered by plaintiff was the result of [the defendant]'s technical inability to process an order request" and that the alleged misrepresentation by the defendant did not affect the value of the security but "merely involved the relationship between [the defendant] and its customers." 127 F. Supp. 2d at 1103.

*Spielman* involved an investor's allegations under six state law causes of action that the defendant misrepresented transaction fees. In *Spielman*, the federal court rejected the defendant's argument that the case was preempted under the federal Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. § 78bb(f) (2000). The case was remanded to the state court. The court observed that "the transaction fees charged by [the defendant] affect the cost of trading, [and] this cost is part of [the defendant]'s bargain with its accountholders." *Spielman v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2001 WL 1182927 at *5. In this regard, the court observed that the plaintiff's lawsuit did not involve the value of any particular security, compare *In re Ames Dept. Stores Inc. Stock Litigation*, 991 F.2d 953 (2d Cir. 1993), nor did it relate to the quality of the investment, compare *Suez Equity Investors v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001), both areas traditionally reserved for federal court.

*Shaw* involved plaintiffs-investors' allegations under state law that the defendant's broker's commission rate for Web-based trading was improper and challenged the efficacy of broker's Web-based trading system as being deficient. In *Shaw*, the federal court rejected the defendant's arguments that the plaintiffs' claims were preempted under the Securities Litigation Uniform

Standards Act of 1998. The case was remanded to the state court. The court observed that the defendant's actions "induced [the plaintiffs] to select Defendant as their broker rather than some other brokerage firm" and that the "claims relate to the vehicle by which [the defendant] delivered securities." 128 F. Supp. 2d at 1274.

█ The court is aware that the federal provisions and state laws at issue in *Abada, Spielman, Shaw,* and other similar cases are not precisely the same as the ones raised herein. However, we take away from such cases the knowledge that in the absence of preemptive regulations, facets of investor claims involving the relationship between investors and their brokers; the bargains struck between investors and their brokers; and the efficacy of a broker's trading system, especially as compared to its representations regarding the same, have been permitted to proceed in state court. The allegations of the fifth "cause of action" which incorporate all previous allegations appear to bear on each of these facets. With due regard to 15 U.S.C. § 78*o*(b)(7) as it relates to operational capability, and in the absence of a record which may clarify appellants' true claims, we are not persuaded that the issues raised by the allegations in the petition's fifth "cause of action," as they are currently pled are preempted.

It has been observed that a court should "not assume that Congress exercises its Supremacy Clause power lightly . . . and [it] must be 'certain of Congress' intent' before [it] find[s] that federal law overrides the balance between state and federal powers." *Missouri Mun. League v. F.C.C.,* 299 F.3d 949, 953 (8th Cir. 2002) (quoting *Gregory v. Ashcroft,* 501 U.S. 452, 111 S. Ct. 2395, 115 L. Ed. 2d 410 (1991)), *cert. granted* No. 02-1386, 2003 WL 1609505 (U.S. June 23, 2003). Given the law and record before us, we cannot make the preemption assumption urged by Ameritrade. Accordingly, we conclude that the district court erred in granting Ameritrade's motion for summary judgment on all "causes of action," including the fifth "cause of action."

## VI. CONCLUSION

The primary purpose of the summary judgment procedure is to pierce the allegations made in the pleadings and show conclusively that the controlling facts are other than as pled. See *Hogan*

*v. Garden County*, 264 Neb. 115, 646 N.W.2d 257 (2002). The summary judgment procedure thus encompasses the opportunity of an evidentiary hearing at which the proponent of the motion for summary judgment may demonstrate by the receipt of evidence its entitlement to judgment. The record properly made in this case does not demonstrate Ameritrade's entitlement to judgment.

Accordingly, we agree with appellants that the evidence and the pleadings do not support the district court's grant of summary judgment. Therefore, we reverse the district court's judgment and remand the cause for further proceedings. We decline to consider appellants' remaining assignments of error, as they are unnecessary to the disposition of the appeal. See *Prucha v. Kahlandt*, 260 Neb. 366, 618 N.W.2d 399 (2000). The order of the district court is reversed, and the matter is remanded for further proceedings.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.