Levine, J.
(dissenting). I respectfully dissent. In my view, plaintiffs’ causes of action against the Toyota defendants for injuries sustained by plaintiff Caryn Drattel, to the extent that they are based upon the failure to manufacture and market the accident vehicle with an airbag installed for occupant crash protection, are superseded under the doctrine of implied conflict preemption by the provisions of the National Traffic and Motor Vehicle Safety Act of 1966 (former 15 USC § 1381 et seq., recodified “without substantive change” in 49 USC § 30101 et seq.) (hereinafter the MV Safety Act), and by the pertinent implementing regulation, Federal Motor Vehicle Safety Standard 208 (49 CFR 571.208) (hereinafter Federal Safety Standard 208).
*54 The MV Safety Act directs the Department of Transportation and its subordinate agency, the National Highway Traffic Safety Administration (NHTSA) to promulgate Federal motor vehicle safety standards that are “practicable” (former 15 USC § 1391 [2]). The legislative history of the MV Safety Act makes clear that the direction to formulate “practicable” standards was intended to require the regulatory agency to give “consideration [to] all relevant factors, including technological ability to achieve the goal of a particular standard as well as consideration of economic factors” (HR Rep No. 1776, 89th Cong, 2d Sess, at 16 [1966]). Similarly, Congress intended that “reasonableness of cost, feasibility and adequate lead time should be included among those factors which the Secretary should consider in making his total judgment [as to safety standards]” (S Rep No. 1301, 89th Cong, 2d Sess, at 6, reprinted in 1966 US Code Cong & Admin News 2709, 2714).
The legislative history in both Chambers of Congress also reflects Congressional intent that motor vehicle safety standards, regulating one of our largest and most vital industries, be uniform:
“The centralized, mass production, high volume character of the motor vehicle manufacturing industry in the United States requires that motor vehicle safety standards be not only strong and adequately enforced, but that they be uniform throughout the country” (id., at 2720 [emphasis supplied]; see also, HR Rep No. 1776, op. cit., at 17).
In order to achieve the goal of uniformity in safety standards, Congress enacted a comprehensively worded preemption clause entitled, “Supremacy of Federal standards; allowable higher standards for vehicles used by Federal or state governments,” which provided:
‘Whenever a Federal motor vehicle safety standard established under this title is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment any safety standard applicable to the same aspect of performance of such vehicle or item of equipment which is not identical to the Federal standard” (former 15 USC § 1392 [d] [emphasis supplied]).
The literal language of the preemption clause broadly invalidates any State “standard” regarding the “same aspect of *55 performance” or “item of equipment,” deviating from the applicable Federal standard. Only an “identical standard” is permitted. Some State high courts have, however, relied on the statutory inclusion of the phrase “minimum standard of performance” in the definition of “safety standard” both to demonstrate a more limited construction of the preemption clause and to negate Congressional intent to achieve uniformity through it (see, Munroe v Galati, 189 Ariz 113, 117-119, 938 P2d 1114, 1118-1119). I believe this misreads the pertinent statutory provisions. The MV Safety Act’s preemption clause expressly provides for only one permissible State deviation from the Federal standards through imposition of higher standards of performance — when a State requires superior performance under its own vehicle procurement policies:
“Nothing in this section shall be construed to prevent the * * * government of any State * * * from establishing a safety requirement applicable to motor vehicles or motor vehicle equipment procured for its own use if such requirement imposes a higher standard of performance than that required to comply with the otherwise applicable Federal standard” (former 15 USC § 1392 [d] [emphasis supplied]).
It is, thus, readily apparent that Federal safety standards are “minimum” standards only in the sense that they present a floor (and not a ceiling) of product safety performance for automobile manufacturers, but are in fact both a ceiling and a floor as to a State’s power to impose safety standards for vehicles sold to the general public regarding the same aspect of performance or vehicle equipment covered by any Federal safety standard. Any other construction of “minimum standard,” either to narrow the meaning of the preemption clause, or to negate Congressional intent to impose uniform safety standards, would render the single, State vehicle procurement exception unnecessary and redundant.
I.
Express Preemption
The broad language and legislative history of the MV Safety Act of 1966 would undoubtedly have required express preemption if New York had enacted, during the pertinent period here, legislation mandating the installation of airbags as part of any occupant crash protection system in all vehicles marketed in *56 the State, and in connection therewith created a statutory cause of action against manufacturers for injuries incurred as a result of noncompliance with the mandate. Federal Safety Standard 208, then in effect, required manufacturers to equip all motor vehicles with an occupant crash protection system, but permitted a choice among three systems, airbags, passive belt restraints or manual belt restraints. Thus, a mandatory airbag restraint statute would “not [have been] identical to the Federal standard,” which was “applicable to the same aspect of performance of such vehicle or item of equipment” (former 15 USC § 1392 [d]). In the plethora of airbag preemption cases nationwide, no appellate court — Federal or State — has suggested that a State mandatory airbag statute or regulation would have passed muster under the Supremacy Clause (US Const, art VI, cl [2]).
Focusing solely on the preemption clause of the MV Safety Act, and ignoring, for the moment, the Act’s “savings clause” (see, former 15 USC § 1392 [d]), I also believe a close reading of the multiple opinions in the more recent United States Supreme Court preemption cases shows that a consistent majority of the Justices would construe the preemption language of section 1392 (d) to preclude the imposition of State common-law tort liability based solely upon the manufacturer’s failure to have installed an airbag on plaintiffs’ 1991 Toyota. The preemption clause employs the term “standard” regarding safety features of a motor vehicle, which a State is prohibited from imposing unless identical to the analogous Federal safety standard.
“Standard,” regarding matters affecting the safety of others, is peculiarly a term of art in the common law of torts. Thus, in its introductory discussion of negligence, a leading treatise in the law of torts identifies the elements of a negligence cause of action as first a “duty * * * requiring the person to conform to a certain standard, of conduct” and second, a “failure on the person’s part to conform to the standard required” (Prosser and Keeton, Torts § 30, at 164 [5th ed] [emphasis supplied]). Black’s Law Dictionary includes within the common meaning of “standard”: “a measure or rule applicable in legal cases such as the ‘standard of care’ in tort actions” (Black’s Law Dictionary 1404 [6th ed 1990] [emphasis supplied]).
In CSX Transp. v Easterwood (507 US 658), the Supreme Court held that a preemption clause in the Federal Railroad Safety Act (45 USC §§ 421-444) invalidating any State “law, rule, regulation, order, or standard relating to railroad safety” *57 (45 USC § 434 [emphasis supplied]), once a Federal regulation was issued covering the same subject matter, preempted a common-law tort claim based upon excessive speed of a train at a grade crossing, in view of regulations fixing a maximum speed at such a crossing (CSX Transp. v Easterwood, supra, at 662, n 2). In Cipollone v Liggett Group (505 US 504), as the majority notes (see, majority opn, at 43), common-law damage actions were deemed preempted by a clause banning any “[pertinent] requirement or prohibition * * * imposed under State law” (Cipollone v Liggett Group, supra, at 521-522). The Cipollone plurality rejected any distinction for preemption purposes between positive law enactments by a State statute or regulation and the imposition of State common-law tort liability:
“As we noted in another context, ‘[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.’ San Diego Building Trades Council v. Garmon, 359 U. S. 236, 247” (Cipollone v Liggett Group, 505 US, at 521, supra).
In the most recent of the Supreme Court’s preemption cases dealing with State common-law liability, Medtronic, Inc. v Lohr (518 US 470), the preemption clause of the Medical Device Amendments of 1976 to the Federal Food, Drug and Cosmetic Act of 1938 (21 USC § 360k [a]) decreed that “[n]o State * * * may establish * * * with respect to a [medical] device * * * any requirement * * * which is different from, or in addition to, any [Federal] requirement” (emphasis supplied). Justice O’Connor, dissenting with the concurrence of the Chief Justice, Justices Scalia and Thomas, held that the plaintiffs’ common-law tort action based upon an allegedly defective pacemaker should be dismissed on the ground of complete express preemption (Medtronic, Inc. v Lohr, 518 US, at 509-510, supra). Justice Breyer, concurring separately with the four-Justice plurality opinion against express preemption, agreed with Justice O’Connor that the preemption clause would invalidate State common-law tort claims if the State tort “standards” were actually “ ‘different from, or in addition to,’ federal standards” (id., at 504 [emphasis supplied]). Justice Breyer, however, deferred to the Federal regulatory agency’s determination that the “different” or “in addition” conditions for preemption had not been met (id., at 506-507).
*58 It thus appears quite evident that a firm majority of at least five Justices of the Supreme Court, as reflected in Cipollone, CSX, and Medtronic, regard State “standards” (CSX Transp. v Easterwood, supra; Medtronic, Inc. v Lohr, supra [Breyer, J.]), “requirement or prohibition” (Cipollone v Liggett Group, supra) and “requirements” (Medtronic, Inc. v Lohr, supra) in preemption clauses as essentially synonymous in reflecting a Congressional preemptive intent to supersede overlapping or conflicting State common-law standards of care applied to impose liability in tort actions such as plaintiffs’ here. It is particularly noteworthy that in none of the foregoing cases did the preemption clause contain any specific reference to common-law standards or requirements. Thus, the absence of any express reference to common-law standards in the preemptive language of former section 1392 (d) cannot be a significant factor in discerning the intent of Congress as to preemption of common-law standards of care here.
Nonetheless, I am otherwise constrained to reject express preemption of plaintiffs’ design defect claims for failure to install airbags, under Supreme Court precedent, because of the MV Safety Act’s “savings clause.” The Supreme Court has applied a presumption against express preemption when the claimed preemptive matters involve “historic police powers of the States” and requires that the intent of Congress to expressly preempt under such circumstances must be “clear and manifest” (Rice v Santa Fe El. Corp., 331 US 218, 230; see, Cipollone v Liggett Group, supra, 505 US, at 518, 523). State common-law remedies for tortious acts can well be considered part of the historic police powers of the States (see, Cipollone v Liggett Group, supra; see also, Taylor v General Motors Corp., 875 F2d 816, 823, cert denied 494 US 1065).
The applicable savings clause in this appeal provides:
“Compliance with any Federal motor vehicle safety standard issued under this title does not exempt any person from any liability under common law” (former 15 USC § 1397 [k]).
I find the savings clause highly ambiguous, and my conclusion is only buttressed by the various judicial interpretations given it. At one extreme, it has been construed as only preserving common-law suits involving claimed product defects not covered by any of the Federal safety standards (see, Harris v Ford Motor Co., 110 F3d 1410). At the other extreme, the majority and the high courts of some sister States read the provi *59 sion as negating even implied preemption of common-law actions (see, Munroe v Galati, 189 Ariz 113, 938 P2d 1114, supra; Tebbetts v Ford Motor Co., 140 NH 203, 665 A2d 345, cert denied 516 US 1072). Most appellate courts, State and Federal, however, have adopted an intermediate interpretation of the savings clause as negating preemption of common-law product liability tort claims except for those in which implied conflict preemption would apply (see, Pokorny v Ford Motor Co., 902 F2d 1116 [3d Cir], cert denied 498 US 853; Taylor v General Motors Corp., 875 F2d 816 [11th Cir], cert denied 494 US 1065, supra; Zimmerman v Volkswagen of Am., 128 Idaho 851, 920 P2d 67, cert denied 520 US 1115).
In light of the principles previously discussed, applying a presumption against express preemption, arid requiring that express preemption provisions be narrowly construed, I have concluded that the ambiguities of the savings clause insofar as it limits preemption by expressly preserving at least some common-law claims, prevent any express preemption of plaintiffs’ no-airbag liability theory.
II.
Implied Conflict Preemption
In addition to express preemption, implied conflict preemption may be found when it is impossible for one to act in compliance with both the Federal and State laws, or when the State law “stanfds] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress” (Hines v Davidowitz, 312 US 52, 67 [emphasis supplied]; Guice v Schwab & Co., 89 NY2d 31, 39, cert denied 520 US 1118; City of New York v Job-Lot Pushcart, 88 NY2d 163, 170, cert denied sub nom. JA-RU v City of New York, 519 US 871). Implied conflict preemption can supersede State common-law tort, contract and agency claims (see, International Paper Co. v Ouellette, 479 US 481; Chicago & N. W. Transp. Co. v Kalo Brick & Tile Co., 450 US 311; Guice v Schwab & Co., supra).
Moreover, State common-law claims may be preempted by Federal regulations promulgated pursuant to Congressional delegation of discretionary quasi-legislative authority (Fidelity Fed. Sav. & Loan Assn. v de La Cuesta, 458 US 141, 153-154).
Contrary to the suggestion of the majority (see, majority opn, at 49), Cipollone v Liggett Group (supra) and Freightliner Corp. v Myrick (514 US 280), read together, do not stand for the *60 proposition that the inclusion of a limited express preemption clause in a Federal statute may render it unnecessary for a court to undertake implied conflict preemption analysis. Freightliner expressly states that “[o]ur subsequent decisions have not read Cipollone to obviate the need for analysis of an individual statute’s pre-emptive effects” (514 US, at 289, supra [emphasis supplied] [citing to implied conflict preemption discussion in CSX Transp. v Easterwood, supra, 507 US, at 673, n 12]). Moreover, even when the plurality opinion in Medtronic rejected express preemption, it acknowledged a remaining “overarching concern” to apply preemption “where a particular state requirement threatens to interfere with a specific federal interest” (Medtronic, Inc. v Lohr, 518 US, at 500, supra [emphasis supplied]), and further recognized the possibility that a future medical device tort claim might “also be pre-empted under conflict pre-emption analysis” (id., at 503 [emphasis supplied]).
Also, contrary to the position of the majority (see, majority opn, at 52), implied conflict preemption is not avoided here merely because Federal automobile safety standards and State tort liability both promote the goal of enhanced traffic safety. “In determining whether Vermont nuisance law ‘stands as an obstacle’ to the full implementation of the CWA, it is not enough to say that the ultimate goal of both federal and state law is to eliminate water pollution. A state law also is preempted if it interferes with the methods by which the federal statute was designed to reach this goal” (International Paper Co. v Ouellette, supra, 479 US, at 494 [emphasis supplied]).
As I previously pointed out, Congress in the MV Safety Act of 1966 directed the Secretary of Transportation to adopt Federal safety standards of performance that were to be “practicable,” and the legislative history unmistakably shows that Congress wanted the regulatory authority to consider the need for uniform standards and a balancing of safety and economic factors to achieve reasonable and practical automotive safety performance requirements.
The Department of Transportation and the NHTSA, to whom the task was delegated, followed the Congressional mandate, especially with respect to standards for occupant crash protection systems. Based upon a weighing of such factors as added safety benefit, technological feasibility, additional costs of installation and likely consumer reaction, the Secretary and the NHTSA, from the inception of the Act throughout the pertinent period here, rejected a mandatory airbag restraint system in *61 favor of giving automakers and, thus, consumers, the option of three alternative occupant crash protection systems — airbags, passive seatbelt restraints, and manual shoulder/lap belt combinations. A typical expression of the competing interests and factors considered is contained in the announcement of proposed rule-making on “Occupant Crash Protection” and “Highway Safety Programs Standards” by the Secretary of Transportation on June 14, 1976:
“This decision also involves the difficult task of assessing and comparing the safety benefits and costs of alternative occupant restraint systems. While the legislative history of the Safety Act indicates that safety is the overriding consideration, the cost of a standard must also be examined. Marginal increments in safety benefits which can be achieved only at great costs are not in the public interest” (41 Fed Reg 24070 [1976]).
In 1984, a successor Secretary of Transportation exercised her rule-making authority to again reject imposing a mandatory airbag installation standard, based on a cost/benefit analysis, in favor of retaining the policy of offering manufacturers and the consuming public alternative modes of occupant crash protection (see, State Farm Mut. Auto. Ins. Co. v Dole, 802 F2d 474, 487-489, cert denied sub nom. New York v Dole, 480 US 951).[1]
Of critical importance to any implied conflict preemption analysis here, Congress, in 1974, confirmed and for all intents and purposes codified, the Secretary’s resolution of the competing factors regarding mandatory airbag installation in the Motor Vehicle and School Bus Safety Amendments of 1974 (see, Pub L 93-492, § 109, 88 US Stat 1482 [adding former 15 USC § 1410b (b)-(d)]). That section expressly preserved the option given an automaker in then Federal Safety Standard 208 to install a seatbelt system without airbags, and prohibited the Department of Transportation from mandating airbags unless it first complied with special hearing procedures and submitted the change to Congress for review and possible nullification in advance of adoption.
*62 The conflict is unmistakably clear between Federal statutory and regulatory policy regarding mandatory airbag restraints in motor vehicles during the pertinent period, and the imposition of common-law tort liability based solely on Toyota’s failure to install an airbag occupant crash protection system in plaintiffs’ vehicle. For plaintiffs to recover on that theory here, a jury must determine that the absence of an airbag in their 1991 Toyota rendered it “not reasonably safe” (Denny v Ford Motor Co., 87 NY2d 248, 257, rearg denied 87 NY2d 969). That issue requires the jury to consider whether “ ‘if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner’” (id., quoting Voss v Black & Decker Mfg. Co., 59 NY2d 102, 108). In making that determination, the jury would be directed to weigh such factors as the product’s utility, the likelihood that it will cause injury, the availability of a safer design and the risk, usefulness and cost of alternative designs as compared to the marketed product (id.; see also, PJI 2:141).
Thus, an award of liability in this case for the absence of an installed airbag would require the jury to conclude that the failure to install an airbag in the accident vehicle rendered it unreasonably dangerous, based largely upon the same balancing of costs, risks, benefits and alternative feasible designs, upon which the Department of Transportation and the NHTSA reached a contrary determination, which was then expressly approved and essentially codified by Congress in enacting former 15 USC § 1410b.[2]
The imposition of common-law liability in this case, for failure to install an airbag, would inevitably undermine the regulatory, interest-weighing cost/benefit determination by *63 Congress under the MV Safety Act and amendments, and by Federal regulators in Federal Safety Standard 208 in effect when plaintiffs’ vehicle was made and marketed. The Federal resolution was to provide manufacturers and consumers a choice among occupant crash protection systems.
The interference with this Federal scheme through tort liability will be no less severe than would State legislative or regulatory adoption of a mandatory airbag installation rule. As Justice Breyer stated in his concurring opinion in Medtronic:
“The effects of the state agency regulation and the state tort suit are identical. To distinguish between them for pre-emption purposes would grant greater power (to set state standards ‘different from, or in addition to,’ federal standards) to a single state jury than to state officials acting through state administrative or legislative lawmaking processes. Where Congress likely did not focus specifically upon the matter, I would not take it to have intended this anomalous result” (Medtronic, Inc. v Lohr, 518 US, at 504, supra [emphasis supplied] [citations omitted]).
Thus, implied conflict preemption is required here because, although State tort liability for the absence of airbag restraints and Federal standards for occupant crash protection systems both advance the goal of automobile occupant safety, tort liability substantially and inevitably interferes with the method, i.e., flexible, occupant crash protection system options, that was adopted by the Federal Government to achieve that goal (see, International Paper Co. v Ouellette, supra, 479 US, at 494; Guice v Schwab & Co., supra, 89 NY2d, at 48; Pokorny v Ford Motor Co., supra, 902 F2d, at 1124-1125).
Indeed, implied conflict analysis cannot cease where the majority ends it — with the conclusion that tort liability in this situation is consistent with the principal goal of automotive safety — because recognizing a common-law cause of action here interferes with other important components of Congressional and Federal regulatory objectives during the pertinent period, including, specifically, uniformity and the decision to give both manufacturers and consumers a choice of restraint systems (see, S Rep No. 1301, op. cit., 1966 US Code Cong & Admin News 2714; 49 Fed Reg 28962, 28989 [1984] [“the Department recognizes the need for the public to become accustomed to the technology and the need for protection, and believes that an *64 across-the-board, mandate too quickly could engender adverse public reaction”]).
As earlier discussed, in Ouellette, the Supreme Court held that Federal pollutant discharge standards under the Clean Water Act (33 USC § 1251 et seq.) preempted common-law nuisance actions, noting that “it is not enough to say that the ultimate goal of both federal and state law is to eliminate water pollution” (International Paper Co. v Ouellette, supra, 479 US, at 494). Likewise, in Guice v Schwab & Co., this Court rejected the notion that because compliance with State common-law disclosure requirements would promote “the same investor-protection purposes of the Federal regulations” there was no preemption of stricter State common-law disclosure requirements by the Securities and Exchange Commission rules (89 NY2d, supra, at 48).
Under Ouellette and Guice, the majority’s conclusion that there is no actual conflict because the tort liability imposed here furthers the automotive safety goal of Congress in the MV Safety Act is not a complete answer to the question posed under implied conflict preemption analysis (see, majority opn, at 52-53). Preserving plaintiffs’ State common-law no-airbag theory of liability conflicts with the Federal goals, with respect to occupant crash protection, of nationwide uniform application of safety standards and flexibility based upon cost/benefit and consumer acceptance factors. Thus, it seems undeniable that the “full purposes and objectives of Congress” will be undermined (Hines v Davidowitz, supra, 312 US, at 67 [emphasis supplied]).
Put another way, State tort recovery for Toyota’s failure to provide an airbag occupant crash protection system in plaintiffs’ vehicle must be superseded under the implied conflict preemption doctrine because it would penalize manufacturers for doing “what the [Federal safety standards and Congress] authorized them to do” (see, Chicago & N. W. Transp. Co. v Kalo Brick & Tile Co., supra, 450 US, at 318), and effectively prohibit automakers from availing themselves of a Federally granted option — installation of a manual shoulder and lap seat-belt restraint system (see, Fidelity Fed. Sav. & Loan Assn. v de La Cuesta, supra, 458 US, at 155).
The parallel between Fidelity Fed. Sav. & Loan Assn. v de La Cuesta and the instant case on implied conflict preemption is close. In Fidelity Fed. Sav. & Loan Assn., Federal regulations opted in favor of flexibility in giving Federal savings and loan institutions the choice to include or omit due-on-sale pro *65 visions in their mortgage instruments. Here, Federal regulations also opted for flexibility in Federal Safety Standard 208, giving automotive manufacturers the choice to include or omit airbags in occupant crash protection systems. In Fidelity Fed. Sav. & Loan Assn., State courts, applying a State judicially fashioned property doctrine with respect to restraints on alienation, invalidated due-on-sale provisions in such mortgage instruments. The Supreme Court’s holding that State law in this respect was superseded under the implied conflict preemption doctrine is equally applicable here:
“Although compliance with both [the Federal option] and the Wellenkamp [State] rule may not be a ‘physical impossibility’ the California courts have forbidden a federal savings and loan to enforce a due-on-sale clause solely ‘at its option’ and have deprived the lender of the ‘flexibility’ given it by [the Federal regulations].” (Id., at 155 [citations omitted].)
III.
Effect of the Savings Clause on Implied Conflict Preemption
Concededly, the savings clause, relied upon by the majority to reject all forms of preemption in this case is broadly (albeit ambiguously) expressed in stipulating that a manufacturer’s compliance with Federal safety standards “does not exempt [it] from any liability under common law” (former 15 USC § 1397 [k]). Nevertheless, I am convinced that the clause does not overcome implied conflict preemption when to do so would demonstrably permit State tort liability to frustrate the “accomplishment and execution of the full purposes and objectives of Congress” (Hines v Davidowitz, supra, 312 US, at 67 [emphasis supplied]).
To construe a savings clause such as this so as to allow survival of a State tort claim actually in conflict with a Federal statutory or regulatory scheme would be unprecedented in United States Supreme Court preemption jurisprudence. Since it can hardly be assumed that Congress would ever intend to honor State law in any form which actually interferes with its own legislative goals, no presumption favoring State law has been applied when the Supreme Court has undertaken implied conflict preemption analysis, even when the subject area is one of traditionally strong State interest (see, Free v Bland, 369 US 663, 666; Taylor v General Motors Corp., supra, 875 F2d, at 826).
*66 Indeed, I would find it unthinkable that this savings clause would be construed to permit imposition of State common-law product liability on, a theory, concededly not present here, which would make it impossible for an automaker to comply with both Federal regulatory and State tort standards of care. The necessity for application of implied conflict preemption to override the savings clause under such circumstances is illustrated in a cogent article on the subject (see, Wilton, Federalism Issues in “No Airbag” Tort Claims: Preemption and Reciprocal Comity, 61 Notre Dame L Rev 1, 21-22 [1986]). There, the author posits a case in which plaintiffs claim of design defect is based on the failure of the windshield in an automobile to pop out in a crash, resulting in serious facial injuries upon impact with the windshield. The article points out, however, that Federal Safety Standard 212 (49 CFR 571.212 [1984]) required “that windshields must remain in place during a crash so that occupants are not ejected.” The author concludes, “[i]n this circumstance, where the alleged defect is required by federal regulations, preemption doctrine would surely apply to block state common law liability” (Wilton, op. cit., 61 Notre Dame L Rev, at 22 [emphasis in the original]).
Consistent with the foregoing analysis, the Supreme Court has repeatedly refused to apply savings clauses at least as broadly worded as former 15 USC § 1397 (k) to preserve State common-law causes of action which actually interfered with Federal statutory or regulatory policy. Thus, former section 22 of the Interstate Commerce Act (recodified in 49 USC § 15103) stipulated that “[n]othing in this act * * * shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies” (emphasis supplied). In 1907, the Supreme Court held that that savings clause “cannot in reason be construed as continuing in shippers a common-law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself (Texas & Pac. Ry. Co. v Abilene Cotton Oil Co., 204 US 426, 446 [emphasis supplied]). And in Chicago & N. W. Transp. Co. v Kalo Brick & Tile Co. (supra), the same savings provision was construed not to obviate implied conflict preemption when to preserve the common-law claim would “impose on common carriers obligations that are plainly inconsistent with the plenary authority of the Interstate Commerce Commission *67 or with congressional policy as reflected in the Act” (450 US, at 318,supra)[3]
In International Paper Co. v Ouellette, despite clauses providing that “nothing in this chapter shall * * * be construed as impairing * * * any right or jurisdiction of the States with respect to the waters * * * of such States” and that “[n]othing in this section shall restrict any right * * * under any statute or common law” (479 US, at 485, supra), the Court held that the Clean Water Act (33 USC § 1251 et seq.), preempted a Vermont common-law nuisance suit based upon pollutant discharges from the New York side of Lake Champlain. And in Guice v Schwab & Co. (supra), our Court similarly rejected the contention that implied conflict preemption was forestalled by section 28 (a) of the Securities Exchange Act which provided that the Federal statute’s rights and remedies are “in addition to any and all other rights and remedies that may exist at law or in equity” (89 NY2d, at 49, supra [emphasis supplied]).
Neither plaintiffs nor the majority have demonstrated any substantive differences between the savings clauses in the foregoing cases and former section 1397 (k) of the MV Safety Act here. Therefore, to the extent that the majority relies upon the savings clause of the MV Safety Act to overcome implied conflict preemption in this case, its position is itself inconsistent with the precedents of the United States Supreme Court and of this Court.
For all of the foregoing reasons, I would reverse and grant the Toyota defendants partial summary judgment, dismissing so much of the complaint as relies upon the absence of an installed airbag as the basis of plaintiffs’ product liability causes of action.
Chief Judge Kaye and Judges Titone, Smith, Ciparick and Wesley concur with Judge Bellacosa; Judge Levine dissents and votes to reverse in a separate opinion.
Order affirmed, etc.

. Another consideration that was weighed in the balance of imposing a mandated airbag restraint system was intense public resistance, which was feared might result in a dismantling, or total rejection of accident crash protection systems by consumers, and the resultant disastrous effect on automotive safety (see, id., 802 F2d, at 487; see also, 49 Fed Reg 28962, 28993 [1984]).

. Significantly, in Medtronic, in finding no preemption the Supreme Court relied heavily on the fact that no similar risk/benefit analysis had been undertaken by the Government agency and that the FDA had taken the position that common-law claims were not preempted (see, Medtronic, Inc. v Lohr, 518 US 470, 496-497, 501, supra). By contrast, as to the pertinent issue here, the Federal Government has consistently taken the position that common-law no-airbag claims are preempted (see, Brief for United States as amicus curiae supporting respondents, at 28-29, Freightliner Corp. v Myrick, 514 US 280, No. 94-286; Brief for United States as amicus curiae, at 13-17, Ritt v General Motors Corp., 7th Cir, No. 88-1822; Brief for United States as amicus curiae, Wood v General Motors Corp., 865 F2d 395, cert denied 494 US 1065, US Sup Ct, No. 89-46). And, as the above discussion reveals, the Department of Transportation here has “weighed the competing interests,” making this a case in the words of the Supreme Court, “quite unlike” Medtronic (Medtronic, Inc. v Lohr, 518 US, at 501, supra).

. A broad savings clause, such as included in the Interstate Commerce Act or the MV Safety Act, may be more appropriately interpreted as negating implied field, preemption but not conflict preemption (see, Pennsylvania R. R. Co. v Puritan Coal Min. Co., 237 US 121, 130; Guice v Schwab & Co., supra, 89 NY2d, at 49-50).