[871 NYS2d 623]

In the Matter of CHRIS BROWN, Respondent, v NEW YORK STATE RACING AND WAGERING BOARD et al., Appellants.

Second Department, January 13, 2009

**APPEARANCES OF COUNSEL**

*Andrew M. Cuomo, Attorney General*, New York City (*Michael S. Belohlavek* and *Laura R. Johnson* of counsel), for appellants.

*Michael Aronow*, Sands Point, for respondent.

*Barbara J. Ahern*, Troy, for New York State Veterinary Medical Society, amicus curiae.

**OPINION OF THE COURT**

Dillon, J.

This appeal raises a simple question that lends itself to a less than simple answer. We are asked to determine whether individuals must be licensed veterinarians to lawfully provide certain dental services to horses. Apparently, no New York ap-

pellate court has ever addressed this issue. We hold, based upon our interpretation of Education Law article 135, that the practice of routine equine dentistry, as performed by the petitioner, does not require a veterinary license.

## I. Relevant Facts

The petitioner, Chris Brown, has been engaged in the practice of routine equine dentistry since 1975. Brown has never been licensed by the State of New York in veterinary medicine nor in veterinary technology. In 1975, Brown obtained a certificate from the Cornell Cooperative Extension Program in Equine Management and Dentistry. He also possessed a license as a "veterinary assistant" issued by a nonparty, the New York Racing Association, Inc. (hereinafter the Racing Association), from 1973 to March 8, 2006, when Brown failed to renew the license.

A veterinary assistant works under the supervision of a licensed veterinarian. As a veterinary assistant, Brown performed routine equine dentistry and maintenance on thoroughbred racehorses stabled at New York Racing Association racetracks such as Aqueduct, Belmont Park, and Saratoga. Routine equine dentistry and maintenance was defined by Brown as consisting of the filing and floating (i.e., smoothing) of horses' teeth and the removal of baby caps from horses' mouths, using various types of files and an oral speculum to keep the horses' mouths open. It also includes the visual inspection of horses' mouths, and if cuts are discovered, the application of salt, a tincture of myrrh, or baking soda. Brown does not administer medications or drugs. According to deposition testimony in this case, unlike human teeth, horse teeth never stop growing; thus, periodic trimming of the teeth is required. Routine equine dentistry also enables horses to better chew and digest oats and to more comfortably and authoritatively bite down on their bit while racing.

During his career, Brown has worked on thoroughbreds owned by, among others, the Queen of England and the Crown Prince of Saudi Arabia, and upon various winners of the Kentucky Derby and the Belmont Stakes. The record does not contain any information that Brown's routine equine dentistry and maintenance has ever been deficient. To the contrary, his services have been requested by many of the greatest owners and trainers in thoroughbred racing and by veterinarians.

Brown was directed by letter dated July 11, 2005, to appear for an "investigative interview" at the office of the appellant,

the New York State Racing and Wagering Board (hereinafter the Racing and Wagering Board). He also was directed to bring with him to the interview any documents qualifying him to perform work as an equine dentist.

The investigative interview was conducted on December 1, 2005. Brown testified under oath as to his training and experience in equine dentistry. He produced a copy of his veterinary assistant license. At the conclusion of the interview, the investigator advised Brown that absent a veterinary technician license issued by the New York State Education Department (hereinafter NYSED), which Brown never obtained, he could no longer practice equine dentistry. The investigator made clear, however, that his instruction not to perform equine dentistry was not an official decision on the issue, as the matter was not yet resolved.

On July 15, 2006, Dr. James Hunt, the veterinarian who supervised Brown at the time, was advised by the Racing and Wagering Board that Brown could no longer work as a veterinary assistant or dental technician.

On July 28, 2006, Brown commenced this proceeding pursuant to CPLR article 78 in the Supreme Court, Nassau County, against the Racing and Wagering Board and NYSED to enjoin the Racing and Wagering Board from preventing him from practicing equine dentistry. The Racing and Wagering Board moved to dismiss the petition on the ground that the proceeding was untimely commenced beyond the four-month statute of limitations measured from the December 1, 2005, investigative interview. The Racing and Wagering Board also argued that the petition failed to state a cause of action since NYSED had administratively determined in a letter dated July 6, 2006, that only licensed veterinarians and licensed dentists can perform actual dental services and procedures upon animals.

The Supreme Court conducted a hearing on the petition on May 23, 2007. Brown's evidence consisted of his own testimony, as well as the testimony of six horse trainers and three licensed veterinarians. The veterinarians, Dr. Albert Cowser Saer, Dr. Russell Cohen, and Dr. Donald Baker, testified that equine dentistry is akin to routine nonveterinary services such as those performed by groomers who apply liniments and bandages to wounds and prepare feed with medication and blacksmiths who take care of foot abscesses and infection, cut and file hooves with a rasp or paring knife, and apply horseshoes. The trainers testified that they routinely treat horse wounds with poultices

and liniments, add supplements and oral medications to feed, and provide leg therapy treatment, without being licensed veterinarians or veterinary technicians. Various witnesses testified that veterinarians are called in to treat serious wounds, administer anesthesia or tranquilizers, administer medications by needle, render diagnoses, and treat infections, digestive problems, or colic. Dr. Baker, whom Brown called as a rebuttal witness, distinguished routine dental trimming performed by Brown on horses from human dentistry, which involves X rays, diagnoses, invasive procedures with drilling, and treatment. All of the veterinarians proffered by Brown testified that, in their opinions, equine dentistry was routine care or prophylactic trimming, not veterinary "diagnosis" or "treatment."

The Racing and Wagering Board presented one witness at the hearing, Dr. Lance Karcher, a veterinarian. Dr. Karcher testified that according to the American Veterinary Medical Association (hereinafter the Association), and in his own opinion, equine dentistry was "within the realm of veterinary medicine." The relevant portion of the Association's manual, which was read into evidence, states that equine dentistry "encompasses all aspects of diagnosis, treatment, and prophylaxis of any and all equine dental conditions and diseases" and as such, "falls within the purview of veterinary medicine." Dr. Karcher testified that he has observed instances where horses suffered as a result of the incomplete work of lay dental individuals, and that the use of hand files to trim teeth has become antiquated.

In the order and judgment appealed from, the Supreme Court, inter alia, found that the proceeding was timely and the petition stated a cause of action, and granted the petition to enjoin the Racing and Wagering Board from preventing Brown from practicing routine equine dentistry. The court found that the dental services provided by Brown "do not involve matters of judgment reserved exclusively for licensed veterinarians, but rather address themselves to ordinary and standard care necessary for the good health and well-being of the horse." (2007 NY Slip Op 34400[U], *5.) We affirm insofar as appealed from.

## II. The Timeliness of the Proceeding

The instant proceeding was timely commenced within the controlling four-month statute of limitations of CPLR 217 (1).

CPLR article 78 review is available within four months of when the administrative determination to be reviewed becomes final and binding upon the petitioner (see CPLR 217 [1]; 7803

[3]; *Matter of Yarbough v Franco*, 95 NY2d 342, 347 [2000]; *New York State Assn. of Counties v Axelrod*, 78 NY2d 158, 165 [1991]; *Matter of Village of Westbury v Department of Transp. of State of N.Y.*, 75 NY2d 62, 72 [1989]). A determination becomes "final and binding" when two requirements are met; namely, completeness (finality) of the determination, and the exhaustion of administrative remedies (*Walton v New York State Dept. of Correctional Servs.*, 8 NY3d 186, 194 [2007]). The parties dispute whether a final determination was rendered on December 1, 2005, when Brown was told to cease the practice of equine dentistry at the conclusion of the investigative inquiry, or on July 15, 2006, when Brown learned that he could no longer work under the supervision of Dr. Hunt.

The plain language contained in the transcript of the December 1, 2005, investigative inquiry reveals that no official decision had been rendered at that time and that the matter was not yet fully resolved. Between December 1, 2005, and July 15, 2006, it would have been reasonable for Brown to believe that the Racing and Wagering Board could change its position on the issue (*see Matter of Jones v Amicone*, 27 AD3d 465, 468 [2006]). There was no clear final determination of the Racing and Wagering Board until July 15, 2006, when Brown learned unequivocally that he could not work as an equine dentist, even under the supervision of a licensed veterinarian (*see generally Matter of Essex County v Zagata*, 91 NY2d 447, 453 [1998] [a pragmatic evaluation must be made whether the decisionmaker has arrived at a definite position]; *Matter of Raffaele v Town of Orangetown*, 224 AD2d 430, 431 [1996] [petitioner's employment status was unclear until the date when she was unequivocally advised that she would not be permitted to return to her job]).

Indeed, the lack of a final determination by the Racing and Wagering Board until mid-July 2006 is supported by facts in the record. After Brown was advised at the conclusion of the December 1, 2005, inquiry that no official decision was rendered, the Racing and Wagering Board sought an opinion from NYSED on whether persons not licensed as veterinarians or veterinary technicians could perform animal dentistry. Frank Munoz, the Executive Director of NYSED, responded by letter dated July 6, 2006, that, given the interpretation by NYSED of the Education Law, only licensed veterinarians, veterinary technicians, and dentists could treat equine teeth. The Munoz letter was stamped "Received" by the Racing and Wagering Board on July 13, 2006.

Dr. James Hunt, the veterinarian who supervised Brown's work at that time, was advised on July 15, 2006, two days after the Racing and Wagering Board received the Munoz letter, that Brown was no longer eligible to act as a veterinary assistant or dental technician.

The sequence of the Racing and Wagering Board's receipt of the Munoz letter on July 13, 2006, and its notification to Dr. Hunt on July 15, 2006, evidences that until that point in time, the Board was still clarifying for itself whether or not Brown could practice equine dentistry. Since the Racing and Wagering Board apparently waited to contact Dr. Hunt until after it received clarification or confirmation from NYSED that Brown could not perform equine dentistry, the Racing and Wagering Board cannot simultaneously claim in this proceeding that its advice to Brown at the investigative inquiry on December 1, 2005, was final and binding so as to trigger the statute of limitations.

The proceeding was commenced within four months after July 15, 2006. The parties challenging the timeliness of the proceeding, in this case the Racing and Wagering Board and NYSED, bear the burden of establishing their statute of limitations defense (*see Matter of Village of Westbury v Department of Transp. of State of N.Y.*, 75 NY2d at 73; *Matter of Castaways Motel v Schuyler*, 24 NY2d 120, 126-127 [1969]; *Matter of Raffaele v Town of Orangetown*, 224 AD2d at 431). The circumstances here do not permit the Racing and Wagering Board and NYSED to meet their burden on the issue of untimeliness and the Supreme Court properly denied the application to dismiss the proceeding pursuant to CPLR 3211 (a) (5).

### III. Brown's Services Do Not Violate Education Law Article 135

Article 135 of the Education Law, sections 6700-6714, entitled "Veterinary Medicine and Animal Health Technology," governs the veterinary medicine and technology profession. Education Law § 6702 provides that the practice of veterinary medicine is limited to licensed veterinarians and to other persons specifically exempted from the law.* Licensed veterinarians are permitted under Education Law § 6702 (2) to employ "veterinary technicians" to assist in the practice of the profes-

* Persons exempted from Education Law § 6702 (1) are specifically defined in Education Law § 6705, which is not applicable here.

sion. "Veterinary medicine" is defined in Education Law § 6701, in relevant part, as "diagnosing, treating, operating, or prescribing for any animal disease, pain, injury, deformity or physical condition." By contrast, a person who practices the profession of "veterinary technology" is defined in Education Law § 6708 (1), in pertinent part, as a person who is "employed . . . under the supervision of a veterinarian to perform such duties as are required in carrying out medical orders as prescribed by a licensed veterinarian requiring an understanding of veterinary science, but not requiring [veterinary licensure]."

The Education Law recognizes another class of "unlicensed persons" who

> "may provide supportive services to a veterinarian, including but not limited to administering oral or topical medications, incidental to and/or concurrent with such veterinarian personally performing a service or procedure, provided such supportive services do not require a knowledge of veterinary science" (Education Law § 6713 [1]).

Read together, Education Law §§ 6701, 6702, 6708 and 6713 divide veterinary caregivers into three categories that represent a sliding scale of training and responsibility; namely, licensed veterinarians, veterinary technicians, and unlicensed persons providing supportive services. The license held by Brown as a "veterinary assistant," while issued by the Racing Association, has no legal foundation in the Education Law.

The parties to this appeal dispute whether or not the equine practices undertaken by Brown qualify as "diagnosing" or "treating" so as to fall within veterinary licensure requirements of Education Law §§ 6701 and 6702. The Racing and Wagering Board, NYSED, and the New York State Veterinary Medical Society (hereinafter the Society), which has submitted an amicus brief, maintain that Brown's admitted activities fall within the scope of diagnosis and treatment. The Society specifically argues that legislative purposes are served by requiring veterinarians to perform equine dental services, as veterinarians conduct complete physical examinations before rendering medical services, maintain detailed records of findings and treatment, take continuing education courses, are subject to state oversight, and, as veterinarians, can better detect dental diseases that should not go untreated. Brown argues, as he did before the Supreme Court, that routine equine dentistry constitutes ordinary nonmedical lay care and maintenance, on a par

with services provided by groomers, trainers, and blacksmiths. Brown also argues that from 1975 to 2006, he practiced routine equine dentistry under his license as a veterinary assistant, and that applicable rules and regulations never required equine dentists to possess a license in either veterinary medicine or veterinary technology.

As a threshold matter, we consider whether the courts are required to defer to the construction given to the Education Law by NYSED, as expressed in the correspondence of Executive Director Frank Munoz dated July 6, 2006, and as explained by Dr. Karcher during the hearing. In the Munoz correspondence, the Education Department rendered an opinion that an unlicensed individual (*see* Education Law § 6713 [1]) can only perform supportive services which do not involve knowledge of veterinary science and which are incidental to or concurrent with services personally performed by a veterinarian. Animal dentistry, the Education Department and Dr. Karcher conclude, has historically been viewed as the practice of veterinary medicine, and lay equine dentists do not fall within the defined exceptions of Education Law § 6705.

When a statute is ambiguous and requires interpretation, the construction given to the statute by an administrative agency responsible for its administration should be upheld by the courts (*see Matter of Robins v Blaney*, 59 NY2d 393, 399 [1983]), unless the agency's interpretation is irrational, unreasonable, or inconsistent with the governing statute (*see Matter of Toys "R" Us v Silva*, 89 NY2d 411, 418-419 [1996]; *see also Matter of Kransdorf v Board of Educ. of Northport-E. Northport Union Free School Dist.*, 81 NY2d 871, 874 [1993]; *Matter of Westhampton Nursing Home v Whalen*, 60 NY2d 711, 713 [1983]; *Matter of Fain v Brooklyn Coll. of City Univ. of N.Y.*, 112 AD2d 992, 993-994 [1985]). However, when a " 'question is one of pure legal interpretation of statutory terms, deference to the [agency] is not required' " (*Matter of Raritan Dev. Corp. v Silva*, 91 NY2d 98, 102 [1997], quoting *Matter of Toys "R" Us v Silva*, 89 NY2d at 419). In such instances, courts should construe clear and unambiguous statutory language as to give effect to the plain meaning of the words used (*see Matter of MERSCORP, Inc. v Romaine*, 8 NY3d 90, 102 [2006, Ciparick, J., dissenting]; *Matter of New York Botanical Garden v Board of Stds. & Appeals of City of N.Y.*, 91 NY2d 413, 419 [1998]; *Matter of Raritan Dev. Corp. v Silva*, 91 NY2d at 106-107).

Here, the Legislature has not defined the key words contained in Education Law § 6701, i.e., "diagnosing" and "treating." We

do not find the terms "diagnosing" and "treating" to be ambiguous. The terms easily lend themselves to their common meanings (*see* McKinney's Cons Laws of NY, Book 1, Statutes § 232; *Matter of Vernon Woods Dev. Corp. v Pucillo*, 134 AD2d 597, 598 [1987]).

The term "treat" is defined as conduct "to care for (as a patient or part of the body) medically or surgically" (Webster's Third New International Dictionary 2435 [2002]). "Medically" is defined as "of, relating to, or concerned with physicians or with the practice of medicine often as distinguished from surgery" (*id.* at 1402). Further, "diagnose" is defined as "to identify (as a disease or condition) by symptoms or distinguishing characteristics" (*id.* at 622; *see State of New York v Abortion Information Agency*, 37 AD2d 142, 145 [1971], *affd on op below* 30 NY2d 779 [1972]). There being no ambiguity in the operative statutory terms, we must necessarily deem the pertinent provisions of the Education Law as subject to pure legal interpretation and give effect to their plain meaning, without necessarily deferring to the interpretation advanced by NYSED.

We agree with the Supreme Court that terms such as "diagnose" and "treat" connote "a therapeutic regimen designed to correct an illness, disease, ailment or condition" exclusively by a licensed veterinarian, and that a contrary interpretation would "blur the distinction between licensed veterinary care and responsible equine health care and maintenance." (2007 NY Slip Op 34400[U] at *5.)

The Legislature, in enacting Education Law § 6701, noticeably makes no mention of dentistry in its definition of veterinary medicine. In this regard, the veterinary language of Education Law § 6701 represents a marked departure from parallel statutes of sister states in our region. New Jersey requires veterinary licensure for any person engaged in "veterinary medicine, surgery [and/or] *dentistry*" (NJ Stat Ann §§ 45:16-5, 45:16-9 [emphasis added]). Connecticut uses phraseology identical to that of New Jersey (Conn Gen Stat § 20-197). In Pennsylvania, veterinary medicine is defined to specifically include the treatment of "dental conditions" (63 Pa Stat Ann § 485.3 [10] [i]). Yet, New York, in enacting Education Law §§ 6701 and 6702, makes no inclusion of dentistry or the treatment of dental conditions in its definition of veterinary medicine. Had the Legislature intended to include animal dentistry within the scope of veterinary medicine, it could have expressly done so, as have other states. We are guided by the

maxim expressio unius est exclusio alterius, that the failure of the Legislature to include a matter within a particular statute is an indication that its exclusion was intended (*see* McKinney's Cons Laws of NY, Book 1, Statutes §§ 74, 240; *Pajak v Pajak*, 56 NY2d 394, 397 [1982]; *Matter of Sweeney v Dennison*, 52 AD3d 882 [2008]). While the Legislature is free to amend Education Law §§ 6701 and 6702 in the future to expressly include animal dentistry within their scope, under the current law Brown is not required to possess a license in veterinary medicine or veterinary technology in order to provide routine equine dentistry and maintenance (*see* Education Law § 6713 [1]).

Under the common meaning of the terms "diagnosis" and "treatment," Brown has not engaged in conduct violative of the statutes. The record is devoid of evidence that Brown's care and maintenance of horses ever included the diagnosis of diseases or conditions by symptoms or distinguishing characteristics. Additionally, his services do not constitute treatment of conditions "medically" or "surgically." Rather, Brown's equine dentistry has apparently been limited to the routine and periodic filing and smoothing of ever-growing horse teeth, the application of salt, a tincture of myrrh, or baking soda to cuts in horses' mouths or tongues, and the nonsurgical removal of "baby caps" to allow incoming "adult" teeth to mature. These tasks are similar to the level of routine care and maintenance provided by groomers, trainers, and blacksmiths to other parts of the horses' bodies, and the performance of those tasks does not require licensure in veterinary medicine or veterinary technology (*see* 5 Ed Dept Rep 249, 250 [1966] [tattooing of dogs not limited to licensed veterinarians as it is not related to the diagnosis or treatment of an animal disease]).

The Racing and Wagering Board and NYSED further argue that under Education Law § 6705 (8), licensed dentists may practice veterinary medicine without a veterinary license, so long as the dentist works under the supervision of a licensed veterinarian. They claim that Education Law § 6705 (8) would have no purpose if providing equine dentistry is not included within the definition of "veterinary medicine." However, in our view, Education Law § 6705 (8) is intended to allow licensed dentists to perform actual "diagnosis" and "treatment" of dental conditions affecting animals, such as the insertion of crowns and dentures (*accord* 3 Ed Dept Rep 268, 269 [1963]), and, by extension, the administration of prescription medications, and the performance of surgery and procedures that

require the training and judgment of someone licensed in dentistry. Here, Brown renders no "diagnosis" or medical "treatment" services requiring dental or veterinary licensure and therefore falls outside the intended scope and purpose of Education Law § 6705 (8).

In light of the foregoing, the order and judgment is affirmed insofar as appealed from.

RIVERA, J.P., COVELLO and ANGIOLILLO, JJ., concur.

Ordered that the order and judgment is affirmed insofar as appealed from, with costs to the respondent.